UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAVALIER D. KNIGHT<br><br>Plaintiff,<br><br>- against -<br><br>NEW YORK CITY, *et al.*<br><br>Defendants. | **1:22-cv-03215 (VEC) (VF)**<br><br>**2nd Amended Complaint (SAC)**<br><br>18 U.S.C. § 242; 42 U.S.C. § 1981; 42 U.S.C. § 1983; 2nd AMENDMENT; COMMERCE CLAUSE; 3rd PARTY STANDING; NY CIVIL RIGHTS LAW § 4; ARTICLE III INJURY-IN-FACT; DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE 14th AMENDMENT; AND THE PRIVILEGES AND IMMUNITIES CLAUSE OF ARTICLE IV, SECTION 2 |

Honorable VALERIE FIGUEREDO, United States Magistrate Judge:

## 1) <u>Commerce Clause Violations</u>

**1.**     This is a case of first impression, Cavalier Knight, LLC is an African-American-owned SBA HUBZone certified small business and PASSPort vendor with the Mayor's Office of Contract Services. With a commodity of 384 - Law Enforcement Equipment and Supplies. Knight has possessed a Federal Firearms License 01 (FFL 01) since 2011 with a Class III Special Occupation Tax Stamp (SOT). As such the State of New York requires Knight to also possess a state Firearms Dealer's License (state FDL) to sell handguns and/or ammunition. **Exhibit 01**

**2.**     Without a state FDL Knight is *de facto* prohibited from bidding on any federal, state, and/or NYC PASSPort contracts in violation of the Commerce Clause, the 2nd Amendment, the Privileges and Immunities Clause of Article IV, Section 2 and this is an Article III *injury-in-fact*. This Court's role is straightforward the Court must answer two questions: (1) does the 2nd Amendment's plain text cover 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) and (2) does historical evidence support the Defendants restrictions?

## JURISDICTION AND VENUE

**3.**     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1343, § 2201, § 2202, and 42 U.S.C. § 1983 and § 1988. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

**4.**     Plaintiff, Cavalier D. Knight, is a natural person, a United States citizen, and a resident of New York County.

**5.**     Defendant, New York City is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of the State.

**6.**     Defendant, Keechant Sewell, is the New York City Police Commissioner. In that capacity, Commissioner Sewell is the statutory handgun licensing officer for the five boroughs that comprise New York City. Commissioner Sewell implements her licensing authority through the NYPD License Division.

## NO JURY TRIAL

**7.**     As Knight seeks equitable remedies, no demand is made for a jury trial.

# **Table of Contents**

1)   Commerce Clause Violations .................................................................. 1
    (1)   New York State Rifle & Pistol Ass'n, Inc. v. Bruen ............................ 7
    (2)   On the Merits of the Claim ............................................................ 7
    (3)   Rule 56. Summary Judgment .......................................................... 7
    (4)   (210) Unconstitutional Commerce Clause Violations .......................... 7
    (5)   Unconstitutional Official Acts ......................................................... 8
2)   Preliminary Statement ........................................................................ 9
    (6)   Constitutional Challenge: 38 R.C.N.Y. & NYC Admin. Code .............. 14
3)   Gibbons v. Ogden: Substantial Effect on Interstate Commerce .................... 15
    (7)   18 U.S.C. § 923 - Licensing .......................................................... 16
4)   Statement of Facts ............................................................................ 17
    (8)   Article III Economic Injury In Fact ................................................ 19
    (9)   NYC PASSPort - Mayors Office of Contract Services .......................... 19
    (10)   Implicit Field Preemption ............................................................ 21
    (11)   CAPA - Section 1042(a)(4) .......................................................... 22
    (12)   27 C.F.R. § 478.50 (a) ................................................................ 23
    (13)   27 C.F.R. § 478.100 (a)(1) .......................................................... 26
    (14)   NYS PL § 400.00 (1-a) ................................................................ 27
    (15)   Injury in Fact, Causation & Redressability ...................................... 27
    (16)   Federal Firearms License 01: Denial and Appeal ................................ 28
5)   Canons of Statutory Construction ........................................................ 29
    (17)   NYS PL § 400.00 (1-a) ................................................................ 29
    (18)   IRS: Business Use or as a Principal Place of Business ........................ 30
    (19)   Third-Party Standing of Customers ................................................ 30
    (20)   ATF Shipping Firearms ................................................................ 31
    (21)   Article III Economic Injury-In-Fact ................................................ 33
    (22)   ATF: Intent to Sell Firearms ........................................................ 33
6)   NYPD: Admits Violating Commerce Clause I .......................................... 36
7)   NYPD: Admits Violating Commerce Clause II ........................................ 37
    (23)   NYS PL § 400.00 (8) .................................................................. 37
    (24)   38 R.C.N.Y. § 4-03 (k) ................................................................ 38
    (25)   State Firearm Dealer's License Application ...................................... 39
8)   Protection For Businesses Providing Related Services ................................ 43
    (26)   3rd Party Constitutional Rights of Gun Stores Customers .................... 46
    (27)   Subject Matter Jurisdiction .......................................................... 47
    (28)   42 U.S.C. § 1981: The Civil Rights Act of 1866 ................................ 49
    (29)   Privileges and Immunities Clause of Article IV, Section 2 .................. 50
    (30)   ATF: Report of Active Firearm Licenses .......................................... 56
    (31)   Brick & Mortar Closures .............................................................. 57
9)   Waiting Periods are Unconstitutional .................................................... 58

## CASES

*Abbott Lab. v. Gardner*, 387 U.S. 136, 148-49 (1967) ................................................. 47

*Ableman v. Booth*, 62 U.S. (21 How.) 506, 523–26 (1858) .......................................... 42

*Albany Area Bldrs. Assn. v. Town of Guilderland,* 74 NY2d at 377 N.Y. (1989) ...... 21

*Anderson v. Carkins*, 135 U.S. 483, 490 (1890) ......................................................... 42

*Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009) .......... 33

*Arizona v. United States*, 567 U.S. 387, 399 (2012) .................................................... 42

*Artec Constr. & Dev. Corp. v. NYC Dep't of Hous. Pres. & Dev.*, No. 15 Civ. 9494
    (KPF), 2017 WL 782911 ........................................................................................ 34

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................................... 35

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) ......................... 44

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth*, 476 U.S. 573, 579 (1986)
    ................................................................................................................................. 48

*Butler v. Michigan*, 352 U.S. 380, 383 (1957) ............................................................ 46

*C & A Carbone, Inc. v. Clarkstown, 511 U.S. 383 (1994)* ........................................... 38

*Carey v. Population Services International*, 431 U.S. 678, 684-88 (1977) ................. 45

*Champion v. Ames (Lottery Case)*, 188 U.S. 321 (1903) ............................................. 40

*Chwick v. Mulvey*, 2010 NY Slip Op 09911 ............................................................... 21

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ......................... 34

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 768 (1988) ...................... 44

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) ..................... 32

*Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958) ................................................................ 42

*Craig v. Boren*, 429 U.S. 190 (1976) ........................................................................... 46

*District of Columbia v. Heller,* 554 U.S. 570 (2008) .................................................. 39

*Doe v. Putnam Cnty.*, 344 F. Supp. 3d 518 (S.D.N.Y. 2018) ...................................... 48

*Eisenstadt v. Baird*, 405 U. S. 438. Pp. 429 U.S. 194-197 (1972) .............................. 47

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ................................................................... 11

Ex parte *Jackson*, 96 U.S. 727, 733 (1878) ................................................................. 44

*Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) ....................................... 28

*Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) ........................... 34

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S.
    167, 180, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) .............................................. 43

*Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) .................... 11

*Granholm v. Heald*, 544 U.S. 460, 473 (2005) ............................................................ 38

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) .................................................... 49

*Hailes v. United Air Lines*, 464 F.2d 1006, 1008 (5th Cir. 1972) ............................... 48

*Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n. 23 (1976) ...................................... 46

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ................. 34

*Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) .................................................... 40

*Hicklin v. Orbeck*, 437 U.S. 518, 98 S. Ct. 2482, 57 L. Ed. 2d 397 (1978) ................ 51

*Homier Distrib. Co. v. Albany*, 90 N.Y.2d 153 (1997) ................................................ 36

*Hu v. City of New York*, No. 18-737 (2d Cir. 2019) ..................................................... 34

*Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) ................................. 35

*Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201-02 (2d Cir. 1977) .................... 48

*International Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ............ 48

*Jancyn Mfg. Corp. v. County of Suffolk,* 71 NY2d at 97 (N.Y. 1987) ........................ 21

*Jonathan Zeron v. Dermot F. Shea*, et al., Index No. 154821/2020 .......................... 55

*Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) .............................. 26

*Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452 (1938) ............................................. 44

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) ........................................................................................................... 43, 44

*Maine v. Taylor*, 477 U.S. 131, 151 (1986).................................................................. 40

*Martinez v. Villanueva*, No. 20-56233 (2022) ............................................................ 60

*Matter of Ames v. Smoot,* 98 AD2d at 119-124) (N.Y. 1984) ..................................... 21

*Matter of O'Connor v. Scarpino*, 83 NY2d 919, 920 ................................................... 25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).................................................... 25

*McDougall v. Cnty. of Ventura,* No. 20-56220 (9th Cir. Jan. 20, 2022) .................... 60

*Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007) .................................................. 49

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943) .......................................................... 50

*Muscarello v. United States*, 524 U.S. 125, 143 (1998) .............................................. 24

*National Audubon Society v. Davis*, 144 F. Supp. 2d 1160 (N.D. Cal. 2000) ........... 43

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S., 142 S. Ct. 2111 (2022) 7

*New York State Rifle & Pistol Ass'n. v. City of New York*, 140 S. Ct. 1525 (2020) ... 40

*Newark Branch, NAACP v. Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990).............. 48

*Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994) .... 35

*Pacific Gas Elec. Co. v. State Energy Resources Conservation Dev. Comm'n*, 461 U.S. 190, 200-03 (1983) ................................................................................................. 47

*People v. De Jesus,* 54 NY2d at 468-470 (N.Y. 1981)................................................ 21

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ...................................................... 47

*Postscript Enters., Inc. v. Whaley*, 658 F.2d 1249, 1252-53 (8th Cir. 1981) ............. 45

*Reilly v. City of Harrisburg*, 858 F.3d 179 (3d Cir. 2017) ......................................... 11

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 740, 743 (5th Cir. 2008) ............. 45

*Rhode v. Becerra*, 445 F. Supp. 3d 902, 953 (S.D. Cal. 2020)................................... 11

*Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. Nov. 17, 2022)................................... 11

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)................. 11

*Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).......... 35

*S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) .............. 60

*Sable Commc's of Cal., Inc. v. FCC*, 492 U.S. 115, 128 (1989)................................. 46

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) ................................................. 22

*Silvester v. Harris*, 843 F.3d 816, 819 (9th Cir. 2016)................................................ 60

*Swedenburg v. Kelly*, 358 F.3d 223 (2d Cir. 2004)..................................................... 17

*Teixeira v. Cnty. of Alameda*, 873 F.3d 677 (9th Cir. 2017)...................................... 59

*Toomer v. Witsell*, 334 U.S. 385, 396 (1948) ............................................................ 51

*United Bldg. & Constr. Trades Council v. Camden*, 465 U.S. 208, 219 (1984)......... 51

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) .......................................................................................................... 44

*United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809) ....................................... 42

*United States v. Reynolds*, 235 U.S. 133, 149 (1914).................................................. 41

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)...................................... 49

*Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 435 (S.D.N.Y. 2013) ...... 35

*Warren v. District of Columbia*, (444 A.2d. 1, D.C. Ct. of Ap. 1981)......................... 43

*Wrenn v. Dist. of Columbia*, 864 F.3d 657 (D.C. Cir. 2017) ...................................... 24

*Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) ..................................................... 40

**(1)**   <u>**New York State Rifle & Pistol Ass'n, Inc. v. Bruen**</u>

**(a)**   In <u>*Bruen*</u>, the Court reasserted principles it clearly applied in <u>*Heller*</u>. There can now be no dispute over the proper approach to evaluating 2nd Amendment claims. First, the Court must determine whether "the 2nd Amendment's plain text covers an individual's conduct" that is being restricted by a challenged law or policy. <u>*Bruen*</u>, 142 S. Ct. at 2129–30. Second, if the answer is yes, the conduct is presumptively protected, and the burden then falls to the government to justify the challenged restriction by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. If the government cannot make this demonstration, the restriction is unconstitutional, full stop. No interest-balancing or levels-of-scrutiny analysis can or should be conducted. *Id*. at 2127. <u>*NY State Rifle & Pistol Ass'n, Inc. v. Bruen*</u>, 597 U.S., 142 S. Ct. 2111 (2022). **Ex 27 - No. 01**

**(2)**   <u>**On the Merits of the Claim**</u>

**(a)**   The phrase on the merits refers to a case whose decision rests upon the law as it applied to the particular evidence and facts presented in the case. This is in opposition to cases whose decisions rest upon procedural grounds. The distinction between decisions that rest on the merits rather than on procedural grounds is important because a decision on the merits is considered final and is thus bound by *res judicata*. If a decision is bound by *res judicata*, the parties involved in the case may not later raise those same claims in a subsequent case.

**(3)**   <u>**Rule 56. Summary Judgment**</u>

**(b)**   Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

**(4)**   <u>**(210) Unconstitutional Commerce Clause Violations**</u>

**(a)**   Knight has presented (210) state constitutional, statutory provisions, and municipal ordinances held unconstitutional or held to be preempted by federal law. And cited numerous U.S. Supreme Court cases including <u>*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*</u>, 597 U.S., 142 S. Ct. 2111 (2022). **Exhibit 02**

**(5)** **Unconstitutional Official Acts**

**(a)** **16 Am Jur 2d, Sec 177 late 2d, Sec 256:** The general misconception is that any statute passed by legislators bearing the appearance of law constitutes the law of the land. The U.S. Constitution is the supreme law of the land, and any statute, to be valid, must be in agreement. It is impossible for both the Constitution and a law violating it to be valid; one must prevail. This is succinctly stated as follows:

**(b)** The General rule is that an unconstitutional statute, though having the form and name of law is in reality no law, but is wholly void, and ineffective for any purpose; since unconstitutionality dates from the time of its enactment and not merely from the date of the decision so branding it. An unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed. Such a statute leaves the question that it purports to settle just as it would be had the statute not been enacted.

**(c)** Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no rights, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed under it.

**(d)** A void act cannot be legally consistent with a valid one. An unconstitutional law cannot operate to supersede any existing valid law. Indeed, as far as a statute runs counter to the fundamental law of the land, it is superseded thereby. No one is bound to obey an unconstitutional law and no courts are bound to enforce it.

**(e)** Strictly speaking, an unconstitutional statute is not a "law," and should not be called a "law," even if a court sustains it, for a finding that a statute or other official act is constitutional does not make it so, or confer any authority to anyone to enforce it.

**(f)** All citizens and legal residents of the United States, by their presence on the territory of the United States, are subject to the militia duty, the duty of the social compact that creates the society, which requires that each, alone and in concert with others, not only obey the Constitution and constitutional official acts, but help enforce them, if necessary, at the risk of one's life.

**(g)** Any unconstitutional act of an official will at least be a violation of the oath of that official to execute the duties of his or her office, and therefore grounds for his or her removal from office. No official immunity or privileges of rank or position survive the commission of unlawful acts. If it violates the rights of individuals, it is also likely to be a crime.

## 2) <u>Preliminary Statement</u>

8.     The Supreme Court was clear that for any gun control legislation to pass constitutional muster under the 2nd Amendment, such legislation must be consistent with historical tradition. The city has had seven months since the <u>*Bruen*</u> decision to identify well-established and representative historical analogues see <u>*Bruen*</u>, 142 S. Ct. at 2133 (analogical reasoning requires only that the government identifies a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster).

9.     Defendants will likely dedicate a significant portion of their argument to discussing the benefits of the firearms regulations however without having presented any evidence of historical analogues will be quite telling. And although Defendants will represent that 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) are constitutional, they will not adequately explain why although such evidence is critical to support that 38 - R.C.N.Y. and/or NYC Admin., Code would pass constitutional muster post-Bruen they would have been available to present this to the Court within their previous arguments however, they have not introduced such evidence here. Certainly, Defendants anticipated the challenges to 38 - R.C.N.Y. and/or NYC Admin., Code and should have been better prepared to defend their constitutionality. Knight implores this Court to consider the only reasonable conclusion from Defendants posturing their dragging of feet is evidence that no such historical tradition and evidence exists.

10. Perhaps at this juncture, there is no bona fide basis for this Court to withhold its ruling because the city will aver it needs more time to come forward with historical evidence that the city had at the time of the creation of the rules and/or codes passage. The Court should therefore proceed to consider the evidence and argument the parties have presented.

11. Defendants will remonstrate against the restraints, urging that the "risk of dangerous and fatal situations looms large if the mandatory requirement to possess a brick & mortar store is enjoined." It is a prod that seeks to embroil this Court in assessing the benefits of the challenged gun control regulations, something this Court is expressly prohibited from doing under Supreme Court jurisprudence. See, _Bruen_ 142 S. Ct. at 2129 (explaining that "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all") (citations and quotations omitted).

12. Again, Defendants must be able to rebut the presumption that the challenged conduct is constitutionally protected by demonstrat[ing] that the regulations are consistent with this Nation's historical tradition of firearm regulations. _Bruen_, 142 S. Ct. at 2126. To reiterate, Defendants may not simply posit that the regulations promote an important interest. Rather, the [Defendants] must demonstrate that the regulations are consistent with this Nation's historical tradition of firearm regulations. The Court should address whether Knight is likely to experience irreparable injury if the rules and/or codes are not enjoined.

**13.** Finding the constitutional deprivations alleged to be irreparable by their very nature, the Court should conclude that Knight has met his burden. In addition to the likelihood of success on the merits, the movant must establish that it is more likely than not that it will suffer irreparable harm absent the relief requested. *Reilly v. City of Harrisburg*, 858 F.3d 179 (3d Cir. 2017). A deprivation of a constitutional right can demonstrate irreparable injury justifying injunctive relief, and "most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (collecting cases). In the 1st Amendment context, a deprivation "unquestionably constitutes irreparable injury," even if the deprivation is for "minimal periods of time." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

**14.** This Court should find that the same is true in the 2nd Amendment context because the 2nd Amendment protects the right to *keep and bear arms* in public for self-defense, state restrictions that are so extensive and burdensome as to render that right illusory must constitute irreparable injury. See, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953 (S.D. Cal. 2020) (finding that burdensome restriction on the purchase of ammunition constituted irreparable injury), vacated and remanded on other grounds sub nom. *Rhode v. Bonta*, 2022 WL 17099119 (9th Cir. Nov. 17, 2022); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) (concluding that District of Columbia's "good reason" requirement to obtain a license to carry concealed firearm constituted irreparable injury). **Ex 27 - No. 02**

**15.** Knight has demonstrated a probability of success on the merits of his Commerce Clause and/or 2nd Amendment challenge to 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) which requires possession of a brick & mortar store to sell handguns and/or ammunition in intrastate and/or interstate commerce and prohibits licenses from purchasing more than one handgun every ninety days. However, Defendants may regulate conduct squarely protected by the 2nd Amendment only if supported by a historical tradition of firearm regulation during the ratification of the 2nd Amendment in 1791.

**16.** Here, Knight has shown that Defendants will not be able to demonstrate a history of firearm regulation to support any of the challenged rules and/or codes. The deprivation of Knight's customer's 3rd party 2nd Amendment rights, as the holders of valid licenses from the state to *keep and bear arms* in public for self-defense, constitutes irreparable injury, and neither the Defendants nor the public has an interest in enforcing unconstitutional laws.

**17.** This Court should press the Defendants as to whether they have empirical evidence to suggest that Knight and/or FFL 01s without a brick & mortar store are responsible for gun crimes or an increase in gun crimes in New York City. However, Defendant's having no such evidence and already having found that Knight and/or FFL 01s are likely to suffer irreparable injury and succeed on the merits of their Commerce Clause and/or 2nd Amendment claims, this Court should find that the balance of equities and the public interest also tip in Knights favor.

18.    FFL 01s are being continuously injured, in fact, by Defendants' enforcement of 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) by prohibiting FFL 01s from transporting and/or receiving inventory and selling handguns and/or ammunition in interstate commerce.

(a)    The state may regulate conduct squarely protected by the 2nd Amendment only if supported by a historical tradition of firearm regulation, here, Knight has shown that Defendants will not be able to demonstrate within the text, history, and tradition of firearm regulation from 1791 to support any of the challenged provisions.

19.    Prohibiting law-abiding citizens from acquiring handguns from Knight and/or FFL 01s strikes at the core of the 2nd Amendment right to *keep and bear arms* in public for self-defense. NYC Admin., Code 10-302.1 (b), prohibits law-abiding citizens from acquiring more than one handgun every ninety days. **Exhibit 03**

(a)    **NYS PL 400.00(6)**: The only authority granted to the licensing authority the NYC, Police Commissioner, is set forth in NYS PL § 400.00(6), which requires an individual with a non-restricted license who resides outside of the 5 boroughs of NYC to apply for an endorsement of their New York State Pistol License (i.e., permission from the Police Commissioner) should they desire to carry concealed within New York City, subject to certain exemptions.

20.    Knight and/or FFL 01s are suffering irreparable harm by having to choose between exercising their constitutional rights to engage in interstate commerce and being subject to criminal prosecution. FFL 01s should not have to risk criminal prosecution to exercise their fundamental right to pursue one's profession or common calling. This is one of the limited number of foundational rights protected under the Privileges and Immunities Clause of Article IV, Section 2. Knight and/or FFL 01s will continue to suffer irreparable harm without the requested relief under, 42 U.S.C. § 1983.

**21.**     38 - R.C.N.Y. and/or NYC Admin., Code discriminates against interstate commerce and violates the Commerce Clause by allowing FFL 01s with a brick & mortar store to only sell their constitutionally protected goods and/or services from one physical location to residents of New York City. However, prohibiting Knight and/or FFL 01s from selling their constitutionally protected goods and/or services intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce because Knight and/or FFL 01s do not possess a brick & mortar store in New York City is unconstitutional.

**22.**     38 - R.C.N.Y. and/or NYC Admin., Code are used to prohibit Knight from receiving a state FDL to sell handguns and/or ammunition in violation of the Equal Protection Clause of the 14th Amendment. And prohibiting Knight's ability to perform work is an Article III economic *injury-in-fact* that violates the Privileges and Immunities Clause and the 3rd party constitutional rights of Knights customers. Prohibiting all law-abiding citizens from acquiring handguns and/or ammunition from Knight and/or FFL 01s in interstate commerce strikes at the *core* of the 2nd Amendment right to *keep and bear arms* in public for self-defense.

### (6)     Constitutional Challenge: 38 R.C.N.Y. & NYC Admin. Code

**23.**     Knight constitutionally challenged 38 R.C.N.Y. and/or NYC Admin., Code as both violate the Commerce Clause *facially* and *as applied* to Knight and/or FFL 01s throughout the country. The state requires Knight and/or FFL 01s to possess a state FDL to sell handguns and/or ammunition yet Defendants *arbitrarily* refuse to issue an applicable state FDL application to Knight and/or FFL 01s. However, any prohibitions on interstate commerce are a form of unconstitutional regulation.

24.     Defendants aver that the application for a state FDL Knight to open a brick & mortar store in the city as a *prerequisite* to apply for a state FDL. However, the cost of opening a brick & mortar store is *cost-prohibitive* and *de facto* adds to the actual cost of the application for a state FDL. Requiring Knight to open a brick & mortar store *de facto* burdens his African American-owned small business through local regulation via financial attrition in violation of the Commerce Clause.

### 3)   Gibbons v. Ogden: Substantial Effect on Interstate Commerce

25.     In 1824, the Supreme Court decided its first major Commerce Clause case in *Gibbons*. Gibbons and Ogden were competitors both operating steamboats that ran from New York to New Jersey. Ogden was granted a monopoly by the New York legislature and requested and was issued, an injunction from the state of New York against *Gibbons*' competing steamboat business. The Supreme Court found the injunction was invalid because it conflicted with a federal statute. The authority for the federal statute itself came from the Commerce Clause. See, *Gibbons v. Ogden*, 22 U.S. 1 (1824). **Ex 27 - No. 03**

26.     The case is important because the New York injunction was not to be enforced in any state other than New York, and so it might appear that the federal statute here should not reach into the state. The Court found, however, that the Commerce Clause empowered Congress to pass acts that would have an effect within a single state so long as the activity regulated had some commercial connection with another state. Otherwise, Congressional power to act in some cases would be only illusory, as a state could prevent federal law from having full force and effect.

27.    Importantly, the *Gibbons* Court pointed out that no area of interstate commerce was reserved for control by the states. At the Court, *Gibbons* pointed to the fact that he obtained a license from the *federal government* to conduct his steamboat business between ports in New York and New Jersey under the federal Coasting Act of 1793. He argued that the monopoly maintained by New York law and the injunction granted by the New York court seemed to conflict with this act of Congress, and should be struck down under the *Supremacy Clause*.

28.    A unanimous decision from the Supreme Court did just that. Chief Justice John Marshall spent a majority of the written opinion investigating whether or not Congress had the authority to regulate and license commercial maritime activity under the Commerce Clause. The Court held that the "power to regulate commerce extends to every species of commercial intercourse ... among the several states," and included the regulation of interstate commercial maritime routes. Marshall asserted that this kind of power is covered under the Commerce Clause because the Founders intended as much when they authored the Constitution.

29.    Like *Gibbons* Knight possesses a federal license (i.e., FFL 01) issued by the U.S. Attorney General to engage in interstate commerce in arms. 38 R.C.N.Y. and/or NYC Admin., Code cannot be used to prohibit Knight and/or FFL 01s from engaging in interstate commerce with law-abiding citizens throughout the country.

(7)    **18 U.S.C. § 923 - Licensing**

(a)    No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General.

**30.**    38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) are local rules and/or codes that conflict with the authority of Congress, to regulate commerce within the state and should be struck down under the *Supremacy Clause* just like the New York steamboat licensing scheme in *Gibbons*.

**4)**    **Statement of Facts**

**31.**    Defendants require Knight and/or all FFL 01s to possess a brick & mortar store in the City of New York, as a prerequisite to apply for a state FDL before they can sell handguns and/or ammunition in the State of New York. However, this prohibits all FFL 01s outside of the city from conducting any business in interstate commerce within the city which is a violation of the Commerce Clause and the 3rd party 2nd Amendment rights of all FFL 01s customers. By prohibiting law-abiding citizens outside of the city from acquiring handguns for self-defense in interstate commerce via mail-order and/or e-commerce from FFL 01s who do not possess a brick & mortar store within the city.

> **(a)**    "Here, the requirement that all wine be shipped through a New York warehouse is a precondition to direct consumer sales. We recognize that 'state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere . . . ha[ve] been declared to be virtually *per se illegal*.'" *See, Swedenburg v. Kelly*, 358 F.3d 223 (2d Cir. 2004). **Ex 27 - No. 04**

**32.**    Defendants have not narrowly tailored 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) which prohibit Knight and/or FFL 01s from receiving a state FDL to sell their constitutionally protected goods and/or services in interstate commerce.

**33.** The Court(s) below erred legally and factually in virtually every aspect of this case, and its decisions, which have unnecessarily lengthened this litigation, even more, and represent a clear abuse of discretion for which mandamus is an appropriate remedy. The Court(s) below allowed Defendants to regulate Knight's business out of business by the lack of judicial oversight and ignoring Knight's FFL 01 and the U.S. Supreme Court precedent set in *Gibbons v. Ogden*, 22 U.S. 1 (1824).

**34.** Defendants have unlawfully made possession of a brick & mortar store in the city by Knight and/or all FFL 01s in the country. A mandatory provision of the application to apply for a state FDL in violation of NYS PL § 400.00(1-a). And made possession of a brick & mortar store and a state FDL in the city by Knight and/or all FFL 01s in the country mandatory.

**35.** What other counties within the state require FFL 01s in the private sector to invest hundreds of thousands of dollars into opening a brick & mortar store in violation of the Equal Protection Clause of the 14th Amendment and the Privileges and Immunities Clause of Article IV, Section 2 before they are allowed to apply for any state licenses required to conduct business under NYS PL § 400.00 (1-a)?

**36.** Prohibiting the ability of Knight and/or FFL 01s to perform work is an Article III economic *injury-in-fact*, and prohibiting law-abiding citizens from the lawful acquisition of handguns to *keep and bear arms* in public for self-defense violates the 2nd Amendment and the 3rd party standing of all law-abiding citizens in the country. Because they cannot acquire Knights and/or FFL 01s constitutionally protected goods and/or services from within New York City.

**37.**    Defendant's prohibitions on interstate commerce and acquiring handguns *facially* and *as applied* violate the Commerce Clause and the 3rd party, 2nd Amendment rights of all law-abiding citizens, and are *repugnant* to that clause of the constitution of the United States, which authorizes Congress to regulate commerce, so far as the said acts prohibit FFL 01s licensed, according to the laws of the United States, for carrying on the firearms trade, from selling such goods within interstate commerce. 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) are *repugnant* to the said Constitution, and void.

### (8)    Article III Economic Injury In Fact

**38.**    Cavalier Knight, LLC has been an SBA HUBZone certified disadvantaged small business since (2010), an NYC PASSPort vendor since (2010), a federal SAM vendor since (2014), and an NYS Contract System vendor since (2016). Knight has possessed an FFL 03 - Collector of Curios and Relics since (2010) and an FFL 01 - Dealer in Firearms since (2011) with a Class 3 SOT since (2020). An NYPD Rifle & Shotgun Permit since (2008) and an NYPD Residence Premises License since (2010). Knight has thirteen carry licenses from AZ, CT, DC, FL, MA, MD, ME, NH, NYC, PA, RI, UT, and VA, Knight's NJ license is pending issuance.

### (9)    NYC PASSPort - Mayors Office of Contract Services

**(a)**    The City of New York procures more than 20 billion dollars of goods and services every year from outside contractors, ranging from nonprofits providing services in our communities to contractors building and maintaining our infrastructure to companies supplying administrative goods and services that enable City Agencies to function effectively and many more. These contractors include a diverse pool of entities in a wide range of industries.

**39.**     As a PASSPort vendor with the Mayor's Office of Contract Services, the city requires Knight to possess a state FDL to sell handguns and/or ammunition. Knight has a commodity of 384 - Law Enforcement Equipment and Supplies. So why are Defendants using 38 R.C.N.Y. and/or NYC Admin., Code to *arbitrarily* prohibit Knight from engaging in intrastate and/or interstate commerce with New York City and/or the NYC Police Department? This is a *conflict of interest* whereas the systemic prohibition on Knight's ability to make and enforce contracts with the city is a violation of 42 U.S.C. § 1981 - The Civil Rights Act of 1866.

> **(a)**     Shortly after ratification of the Thirteenth Amendment in December 1865, on January 5, 1866, Lyman Trumbull, the Senator from Illinois, introduced the first federal civil rights bill in the nation's history. According to Trumbull, the "abstract truths and principles" of the Thirteenth Amendment meant nothing "unless the persons who are to be affected . . . have some means of availing themselves of their benefits." President Andrew Johnson vetoed the bill, antagonistic to the claims of equality of African Americans and inflexible in his belief that market forces would eventually resolve the issue. The veto message incensed Congress, who had before it mountains of evidence of widespread mistreatment of African Americans throughout the South by both private and public parties.  Congress overrode Johnson's veto on April 9, 1866, and elements of the Civil Rights Act of 1866 eventually became the template for the Fourteenth Amendment.

**40.**     This egregious abuse of administrative power has caused Knight's African-American-owned small business irreparable harm by *de facto* prohibiting him from acquiring inventory required to sell handguns and/or ammunition in interstate commerce. Defendants have *de facto* prohibited Knight from bidding on any, federal SBA HUBZone contracts, federal System for Award Management (SAM) contracts, and NYS Contract System contracts, this includes multiple prohibited NYC PASSPort contracts which are an Article III economic *injury-in-fact*. **Exhibit 04**

### (10)   Implicit Field Preemption

**41.** Where the state has preempted the field, and local rules and/or codes regulate the same subject matter they are deemed inconsistent with the state's transcendent interest, whether or not the terms of the local law(s) actually conflict with a state-wide statute *Albany Area Bldrs. Assn. v. Town of Guilderland,* 74 NY2d at 377 N.Y. (1989). Thus, when the legislature has demonstrated its intent to preempt the field, all local ordinances (i.e., 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b)) are preempted, regardless of whether they actually conflict with the state law (*id.;* see *Jancyn Mfg. Corp. v. County of Suffolk,* 71 NY2d at 97 (N.Y. 1987); *People v. De Jesus,* 54 NY2d at 468-470 (N.Y. 1981); *Matter of Ames v. Smoot,* 98 AD2d at 119-124) (N.Y. 1984). **Ex 27 - No. 05**

**42.** Accordingly, in light of the comprehensive and detailed regulatory language and scheme of Penal Law § 400.00, which demonstrates the Legislature's intent to preempt the field of firearm regulation, it preempts 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b). Field preemption is implied when either the purpose and scope of the regulatory scheme will be so detailed or the nature of the subject of regulation will be such that the court may infer a legislative intent to preempt, even in the absence of an express statement of preemption see, *Chwick v. Mulvey*, 2008 NY Slip Op 09911. **Ex 27 - No. 06**

> **(a)** As noted, the State preemption doctrine is a "fundamental limitation on home rule powers." Although Article IX vests local governments with substantial lawmaking powers by affirmative grant, "the overriding limitation" of the preemption doctrine embodies "the untrammeled primacy of the Legislature to act with respect to matters of State concern. **Exhibit 05 pp. 15 - 19**

**43.**     The decisions of the Court(s) below are an improvident exercise of *judicial discretion* and *judicial overreach* that reflects the Court's misunderstanding about the nature of Knight's irreparable harm, the structure of these kinds of constitutional claims, and the proper decision method for evaluating alleged infringements of 2nd Amendment rights. The irreparable harm and economic injury to Knight's African American-owned small business and the violation of the 3rd party standing of the 2nd Amendment rights of Knight's and/or FFL 01's customers cannot be remedied by damages. "Whereas if a state converts a right into a privilege, the citizen can ignore the license and fee and engage in the right (liberty) with impunity." *See, Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969). **Ex 27 - No. 07**

### (11)   CAPA - Section 1042(a)(4)

**44.**     Regulatory Agenda (a)(4) an identification, to the extent practicable, of all relevant *federal*, *state*, and local laws and rules, including those which may duplicate, overlap or conflict with the proposed rule. **Exhibit 06**

**45.**     Defendants require Knight and/or all FFL 01s to possess a state FDL and brick & mortar store with security to store inventory. New York City zoning laws, prohibit Knight from storing inventory locally at his current place of business, however, under 27 C.F.R. § 478.50 (a) inventory can be stored at any ATF-approved off-site storage locations throughout the country. **Exhibit 07**

**(12)** [27 C.F.R. § 478.50 (a)](#)

**(1)**     The license covers the class of business or the activity specified in the license at the address specified therein. A separate license must be obtained for each location at which a firearms or ammunition business or activity requiring a license under this part is conducted except:

**(a)**     <u>No license is required to cover a separate warehouse used by the licensee solely for storage of firearms or ammunition</u> if the records required by this part are maintained at the licensed premises served by such warehouse;

**(b)**     A licensed collector <u>may acquire curios and relics at any location</u>, and dispose of curios or relics to any licensee or to other persons who are residents of the State where the collector's license is held and the disposition is made;

**(c)**     <u>A licensee may conduct business at a gun show pursuant to the provision of § 478.100</u>;

46.     If the *core* of the 2ⁿᵈ Amendment right is to *keep and bear arms* in public for self-defense to promote the *public safety* of all law-abiding citizens. Then Defendant's prohibition on Knights and/or FFL 01's ability to sell handguns and/or ammunition in intrastate and/or interstate commerce to those law-abiding citizens, conflicts with the government's transcendent interest in promoting *public safety* which *facially* and *as applied* violates the Commerce and Supremacy Clauses.

47.     Defendants aver that because Knight does not possess a brick & mortar store in New York City, he is ineligible to receive a state FDL. Therefore the requirement to possess a brick & mortar store in the city *facially* and *as applied* violates the Privileges and Immunities Clause of Article IV, Section 2.

48.     The *Heller* test is a hardware test, is the firearm commonly owned by law-abiding citizens? Is it owned by those citizens for lawful purposes? If the answers are yes, the *Heller* test is over, and the firearms are protected.

**49.**    Thus, when a law bans possession of an item, under *District of Columbia v. Heller*, 554 U.S. 570 the Court should first ask whether the banned item qualifies as arms under the 2nd Amendment. If so, the Court should ask only whether the banned item is (1) commonly used, (2) by law-abiding citizens, (3) for lawful purposes, (i.e., self-defense) see, *Heller* 554 U.S. at 625, 635. **Ex 27 - No. 08**

**50.**    If so, then the banned item is categorically protected under the 2nd Amendment and no further analysis is needed. *Id.* at 634-35. By adopting this test, the Court would honor the *text, history, and tradition* of the 2nd Amendment as instructed in *Heller*, see *id.* at 628-29. *Heller* held that the 2nd Amendment protects "the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. And it explained that the term bear, as used in the text, means to wear or to carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in case of conflict with another person. *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). **Ex 27 - No. 09**

**51.**    Conflict with another person often occurs outside one's home, the right to *bear arms* necessarily includes a right to carry a handgun outside the home. *See, Wrenn v. Dist. of Columbia*, 864 F.3d 657 (D.C. Cir. 2017); Indeed, there would have been no need for the historical restrictions on carrying handguns in sensitive places, *Heller*, 554 U.S. at 626, if the right were confined to the home. **Ex 27 - No. 10**

**52.**     Defendants aver that 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) were promulgated under NYS PL § 400.00 to advance the state's interest in public safety. However, these local ordinances are preempted by NYS PL § 400.00. Which is the exclusive statutory mechanism for the licensing of firearms in the State of New York. *See*, *Matter of O'Connor v. Scarpino*, 83 NY2d 919, 920. **Ex 27 - No. 11**

**53.**     Defendants aver that Knight and/or all FFL 01s must possess a brick & mortar store under 38 R.C.N.Y. § 4-03 (t) and/or NYC Admin., Code § 10-302 (c)(1) as a *prerequisite* to applying for a state FDL to sell handguns and/or ammunition. However, possession of a brick & mortar store is a condition created by the Defendants. If a brick & mortar store is the only location that can be utilized as a place of business for a firearms dealer the legislature would have specified this within NYS PL § 400.00 (1-a). Numerous FFL 01s throughout the state conduct business as an FFL 01 intrastate via gun shows and intrastate and/or interstate via mail-order and/or e-commerce and/or from their homes where zoning permits. **Exhibit 08**

**54.**     Like the cases of *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Here the Defendants ban selling an entire class of very popular firearms that are lawful under federal law and the laws of most states and that are commonly held by law-abiding citizens for lawful purposes. Under no level of constitutional muster can 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) survive these egregious violations of the Commerce Clause. **Ex 27 - No. 12**

**55.**     Defendant's prohibition on the sales of handguns and/or ammunition intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce strikes at the *core* of the 2nd Amendment right. *Heller* held that the *core* 2nd Amendment right is a law-abiding citizen's ability to purchase handguns for *self-defense* 554 U.S., at 635; see *also Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (2nd Amendment guarantees are at their zenith within the home). *Self-defense* [is] the central component of the right itself. **Ex 27 - No. 13**

**56.**     38 R.C.N.Y. and/or NYC Admin., Code are being used to preempt 27 C.F.R. § 478.100 (a)(1) and/or NYS PL § 400.00 (1-a). By mandating that Knight must possess a brick & mortar store to apply for a state FDL. Defendants are unlawfully prohibiting Knight from transporting inventory to gun shows and/or off-site storage locations in violation of the Commerce Clause.

**(13)   27 C.F.R. § 478.100 (a)(1)**

**(a)**     A licensee may conduct business temporarily at a gun show or event as defined in paragraph (b) if the *gun show* or event is located in the same State specified on the license: Provided, That such business shall not be conducted from any motorized or towed vehicle. The premises of the gun show or event at which the licensee conducts business shall be considered part of the licensed premises. Accordingly, no separate fee or license is required for the gun show or event locations. However, licensees shall comply with the provisions of § 478.91 relating to posting of licenses (or a copy thereof) while conducting business at the gun show or event.

**(1)**     A licensed importer, manufacturer, or dealer may engage in the business of dealing in curio or relic firearms with another licensee at any location.

**(a)**     A gun show or an event is a function sponsored by any national, state, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other *sporting use of firearms* in the community.

**(14)    NYS PL § 400.00 (1-a)**

**(a)**    No person shall engage in the business of gunsmith or dealer in firearms unless licensed pursuant to this section. An applicant to engage in such business shall also be a citizen of the United States, more than twenty-one years of age and **shall be required to maintain a place of business in the city or county where the license is issued**. For such business, if the applicant is a firm or partnership, each member thereof shall comply with all of the requirements set forth in this subdivision and if the applicant is a corporation, each officer thereof shall so comply.

**(15)    Injury in Fact, Causation & Redressability**

**57.**    Within a prior vacated disapproval for a Carry ~~Business~~ License, Defendants stated that if Knight were to transport any inventory under his FFL 01 he would be subject to criminal liability (i.e., felony charge and/or arrest) which constitutes irreparable and is an Article III *injury-in-fact.*

**(a)**    You state that you travel with firearms for retail sale (Interview Questionnaire, Question 61). **Please be advised that since you do not have a gun dealer license issued by the Police Commissioner, you are not authorized to travel with firearms for retail sale in New York City, and doing so may subject you to criminal liability**.

**(b)**    If you wish to apply for a gun dealer license in New York City, you may obtain an application from License Division by contacting Associate Investigator Gilliam at (646) XXX XXXX. **However, before doing so, please note that you do not fulfill some of the requirements, such as having a business location in New York City with a certificate of occupancy that allows a firearms dealer to operate at the location (NYC Administrative Code, Section 10-302), as you have previously been informed**.

**58.**    Defendants also averred that Knight is ineligible for a state FDL and then *arbitrarily* claimed that if he still wished to apply for one he should contact the NYPD LD for an application which is *reductio ad absurdum.* This has caused Knight's African-American-owned small business irreparable harm. **Exhibit 09**

**59.**     The 3rd party standing and 2nd Amendment violations of the rights of FFL 01s customers whereas the 2nd Amendment and NY Civil Rights Law § 4 commands that the right to *keep and bear arms shall not be infringed.* Defendants carry the burden of establishing that 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) are reasonably tailored. The Court(s) below were fully aware that these local ordinances prohibited Knight and/or FFL 01s from lawfully selling firearms in interstate commerce. See, *Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (government bears the burden of justifying its action under the heightened standard of judicial review). Defendants were not required to justify their actions. **Ex 27 - No. 14**

### (16)   Federal Firearms License 01: Denial and Appeal

**60.**     Knight's initial application for an FFL 01 was denied. The ATF stated that Knight did not have a lawful place of business in the city. **Exhibit 10**

**(a)**     Your application for a Federal firearms license (*"FFL"*) as a dealer in firearms other than destructive devices under Title 18, United States Code, Chapter 44, is being denied. This notice explains the basis for the denial.

**(b)**     **Authorization for Denial:**

**(c)**     Pursuant to the provisions of 18 USC § 923(d)(1) the Attorney General may deny an application for licensing if:

**(d)**     (E) The applicant does not have in a State (i) premises from which he conducts business subject to license under this chapter or from which he intends to conduct such business within a reasonable period of time; "to wit, you are not licensed by the City of New York to engage in your intended operations pursuant to a FFL at the location identified on your application."

**(e)**     For this reason, you do not meet the minimum requirements for licensing pursuant to 18 USC § 923(d)(1)(E) and your application for a license is hereby denied.

**61.**    Knight requested a hearing where he **(1)** validated that possession of an FFL 01 is required before any applicant can apply for a state FDL from Defendants. **(2)** Item No. 14 of the FFL 01 application, states that an *apartment* is a lawful place of business for an FFL 01. **(3)** Item No. 16 of the application asks ***"Do you intend to sell firearms at Gun Shows and/or conduct Internet sales?"*** The ATF immediately reversed Knight's denial and issued his FFL 01. **Exhibit 11**

**62.**    However although Knight has a place of business under federal law, Defendants still aver that Knight does not have a lawful place of business under 18 U.S.C. § 923 (d)(1)(E), NYS PL § 400.00 (1-a), and § 12-10 - NYC Zoning Resolution. Under 27 C.F.R. § 478.50 (a), inventory can be stored at off-site storage locations invalidating Defendant's unlawful requirement that Knight and/or FFL 01s can only utilize a brick & mortar store in New York City to conduct business. Knight and/or FFL 01s can conduct business intrastate at gun shows and intrastate and/or interstate via mail order and/or e-commerce.

**5)    Canons of Statutory Construction**

**(17)    NYS PL § 400.00 (1-a)**

**(a)**    No person shall engage in the business of gunsmith or dealer in firearms unless licensed pursuant to this section. An applicant to engage in such business shall also be a citizen of the United States, more than twenty-one years of age and **shall be required to maintain a place of business in the city or county where the license is issued**. For such business, if the applicant is a firm or partnership, each member thereof shall comply with all of the requirements set forth in this subdivision and if the applicant is a corporation, each officer thereof shall so comply.

63.     If there is more than one interpretation of what defines a place of business under NYS PL § 400.00 (1-a) it can be considered ambiguous. Knight does not conduct any retail sales at his place of business he only performs administrative and/or managerial activities from his home which qualifies as a place of business in New York City. The Department of City Planning defines Knight's business as a *home occupation* under § 12-10 - NYC Zoning Resolution. **Exhibit 12**

64.     § 12-10 - NYC Zoning Resolution allows a *home occupation*, and 27 C.F.R. § 478.50 (a) allows inventory to be stored off-site. This conflicts with Defendant's requirement that Knight and/or FFL 01s must possess a brick & mortar store in New York City. The IRS also states that a home can be used for Trade or Business Use and/or as a Principal Place of Business for tax purposes. **Exhibit 13**

(18)   <u>**IRS: Business Use or as a Principal Place of Business**</u>

(a)     A portion of your home may qualify as your principal place of business if you use it for the ***administrative or management activities of your trade or business*** and have no other fixed location where you conduct substantial administrative or management activities for that trade or business.

(19)   <u>**Third-Party Standing of Customers**</u>

65.     Cavalier Knight, LLC is a separate legal entity, apart from its members. Therefore Defendant's prohibition on Cavalier Knight, LLCs ability to perform work violates the 3rd party standing of Cavalier D. Knight (i.e., a law-abiding citizen). By prohibiting Cavalier D. Knight from purchasing handguns from his separate legal entity Cavalier Knight, LLC. This prohibits Cavalier Knight, LLC from engaging in intrastate and/or interstate commerce with Cavalier D. Knight a law-abiding citizen seeking to acquire handguns to *keep and bear arms* in public for self-defense.

**66.**     There is no lawful reason for Defendants to force Knight and/or FFL 01s

to possess a brick & mortar store in New York City when inventory can be stored at

off-site locations and firearms can be sold intrastate at gun shows and intrastate

and/or interstate via mail-order and/or e-commerce.

**(20)**   **ATF Shipping Firearms**

**(a)**     What if I only sell firearms at flea markets, gun shows or over the
Internet?

**(b)**     A person can be engaged in the business of dealing in firearms
regardless of the location in which firearm transactions are conducted.
A person can be engaged in the business of dealing in firearms even if
the person only conducts firearm transactions from a location other than
a traditional brick and mortar store. **Many licensed gun dealers
conduct business at temporary locations such as qualified gun
shows or events, and utilize the internet to facilitate firearm
transactions**. The question under federal law is not where firearm
transactions are conducted, but rather is whether under a totality of the
circumstances the person conducting those transactions is engaged in
the business of dealing in firearms. The factors listed below apply to that
determination regardless of where the firearm transactions occur.

**(c)**     The growth of new communications technologies and e-commerce
allows sellers of firearms to advertise to an expansive market at
minimal cost, and complete sales with minimal effort. While a collector
or hobbyist may use the internet and other communication technology
to sell a firearm without a license (provided that they comply with all
other federal and state laws and regulations), **those engaged in the
business of dealing in firearms who utilize the internet or other
technologies must obtain a license, just as a traditional dealer
whose business is run out of a traditional "brick and mortar"
store**.

**67.**     "Neither the GCA nor its implementing regulations contain specific

provisions, requiring that an FFL have firearms shipped to their licensed business

premises when receiving firearms. To that end, an FFL may lawfully receive firearms

at their mailing address, storage location, or other address where the licensee intends

to ensure the safe and secure receipt of the firearms." **Exhibit 14**

68.    Defendants aver that Knight's FFL 01 prohibits him from possessing inventory. However, 27 C.F.R. § 478.50 (a) allows a separate warehouse solely for the storage of firearms or ammunition. Knight's equal protection and/or procedural due process claim is an assertion that he is being treated differently than other FFL 01s because he does not possess a brick & mortar store in the city. And there is no justification for such disparate treatment. The requirement to possess a brick & mortar store to obtain a state FDL violates his right to equal protection of the law.

69.    Indeed, just like the gun-range ban in *Ezell* prevented Chicagoans from meeting a Chicago Firearms Permit prerequisite of legal gun ownership. Defendant's prohibition on Knight's and/or any FFL 01's ability to sell handguns and/or ammunition intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce, prevents law-abiding citizens from fulfilling, the most fundamental prerequisite of legal gun ownership which is the simple acquisition of handguns for the right to *keep and bear arms* in public for self-defense.

70.    The Supreme Court long ago made it clear that one is not to have the exercise of his or her liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place. In *Ezell I* the city could not defend its regulatory scheme with shoddy data or reasoning. The municipality's evidence must fairly support its rationale for its ordinance. 651 F.3d at 709 (quoting *City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425, 438 (2002)). **Ex 27 - No. 15**

**71.** To borrow from the free-speech context, there must be evidence to support the city's rationale for the challenged regulations; *lawyers' talk is insufficient*. *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009). Here, as in *Ezell I*, the city's defense of the challenged zoning rules rests on sheer speculation about accidents and theft, 651 F.3d at 709. That's not nearly enough to satisfy its burden. **Ex 27 - No. 16**

### (21) Article III Economic Injury-In-Fact

**72.** Inventory can be transported to off-site storage locations and sold intrastate at gun shows and intrastate and/or interstate via mail order and/or e-commerce. Without the excessive overhead required to maintain a brick & mortar store in the city. Defendants are aware that leasing a commercial brick & mortar store in the city is cost-prohibitive. And this is used to discourage FFL 01s from establishing this type of business in the city. Defendants are acting in the capacity of the state legislature by regulating FFL 01s out of business in the city. **Exhibit 15**

### (22) ATF: Intent to Sell Firearms

**(a)** ATF has indicated a license can be issued for persons whose **intent is to sell firearms primarily at gun shows, the internet, or by mail**. To qualify for a license, must applicants also sell firearms from their premises?

**(b)** **NO.** The February 17, 2017 correspondence simply recognizes that ATF does not issue different classes or categories of 01 licenses to persons based upon which or how many of the options for conducting business an applicant intends to exercise at the time the application is filed.

**(c)** **Once issued, a dealer's license allows the licensee to sell firearms by any means or from any location otherwise permitted by law regardless of their intent at the time of application**.

**73.** Knight brings an Equal Protection claim under the Equal Protection Clause of the 14th Amendment. Which mandates that all similarly situated individuals be treated alike. *See, City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, Courts have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials. *See*, *Artec Constr. & Dev. Corp. v. NYC Dep't of Hous. Pres. & Dev.*, No. 15 Civ. 9494 (KPF), 2017 WL 782911, at *2 (S.D.N.Y. Feb. 27, 2017) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)). **Ex 27 - No. 17**

> **(a)** An individual may assert either a class of one or selective enforcement equal protection claim. An individual does not need to identify as a member of a class or a group to be entitled to equal protection. For an equal protection clause analysis, a class can consist of a single member. This class-of-one doctrine protects individuals from wholly arbitrary acts of state governments. To qualify for class-of-one equal protection, an individual must first show that he or she was treated differently from similarly situated persons and that the different treatment was intentional and had no rational basis. Then, the individual must show that this differential treatment flows from an illegitimate animus, rather than from coincidence, chance, or a permissible governmental classification. Furthermore, an individual is only entitled to a class-of-one equal protection doctrine if he was intentionally singled out because of his membership in the class.

**74.** To proceed under this theory, Knight must show an extremely high degree of similarity between [himself] and [other] FFL 01s. *See*, *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). As the Second Circuit recently clarified in *Hu v. City of New York*, No. 18-737 (2d Cir. 2019). **Ex 28 - No. 18**

**75.**     Knight has established that all FFL 01s are *prima facie* identical. By showing that **(1)** no rational person could regard the circumstances of Knight to differ from those of another FFL 01 to a degree that would justify the differential treatment based on a legitimate government policy, and **(2)** the similarity in circumstances and difference in treatment is sufficient to exclude the possibility that Defendants acted based on a mistake. Post - *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) a complaint must make sufficient factual allegations in support of this similarity requirement to survive a motion to dismiss an equal protection claim. See, *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010). Courts require more than a bare allegation that other individuals were treated differently. See, *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 435 (S.D.N.Y. 2013). **Ex 28 - No. 19**

**76.**     Defendants refuse to issue Knight a state FDL because he does not possess a brick & mortar store in New York City. The Equal Protection Clause of the 14th Amendment prohibits a state from denying its residents equal protection under the law. It prohibits a state from classifying people in a way that restrains fundamental rights such as the right to engage in interstate commerce under the Privileges and Immunities Clause, without meeting heightened scrutiny. See*, Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995). Discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994). **Ex 28 - No. 20**

**6)**     <u>**NYPD: Admits Violating Commerce Clause I**</u>

    **77.**     Knight has two letters from Defendants that acknowledge that they are aware that 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) violate the Commerce Clause. Knight received a letter from the former Director of the NYPD LD Thomas M. Prasso dated October 27, 2015. This letter stated that NYC Admin., Code § 10-302 only allows firearms sales "to be conducted in person at a physical location (i.e., brick & mortar) that can be identified by street and number with a **certificate of occupancy** which allows a firearms dealer to operate at the location." **Exhibit 16**

    **(a)**     <u>**You are correct that the application for a gun dealer license does not contain provisions for dealers conducting internet sales of firearms**</u>. New York City Administrative Code section 10-302 requires that all firearms sales be conducted in person at a physical location that can be identified by street and number. The license must mention and describe the premises for which it is issued. The license is only valid for that location and must be prominently displayed therein. <u>**In addition, the premises must possess a certificate of occupancy which allows a firearms dealer to operate at the location**</u>.

    **78.**     Defendants claim that NYC Admin., Code § 10-302 only allows FFL 01s to sell firearms intrastate to residents of New York City in person from a brick & mortar store location. But prohibits sales intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce which *facially* and *as applied* violates the Commerce Clause. See, *Homier Distrib. Co. v. Albany*, 90 N.Y.2d 153 (1997) **Ex 28 - No. 21**

**79.**      NYS PL § 400.00 (1-a) does not require Knight and/or FFL 01s to possess a brick & mortar store to apply for Defendant's fictitious NYC Gun Dealer License. Whereas there is no such thing as an NYC Gun Dealer License there is only a state FDL issued under NYS PL § 400.00 (1-a) by the NYPD Police Commissioner as the statutorily designated handgun licensing officer in New York City. **Exhibit 17**

## 7)  NYPD: Admits Violating Commerce Clause II

**80.**      Knight also received an additional letter from the former Director of the NYPD LD Jonathan David dated January 25, 2017. Stating that 38 R.C.N.Y. prohibits Knight and/or FFL 01s from selling their constitutionally protected goods and/or services intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce. **Exhibit 18**

**81.**      Defendants stated that 38 R.C.N.Y. prohibits Knight and/or FFL 01s from selling handguns at sporting arms events. Under 27 C.F.R. § 478.100 (a)(1) and NYS PL § 400.00 (8) all gun shows are sporting arms events. If there are no provisions permitting Knight and/or FFL 01s to sell firearms at sporting arms events under 38 R.C.N.Y.  This local rule is preempted by 27 C.F.R. § 478.100 (a)(1) and/or NYS PL § 400.00 (8) which allows FFL 01s to engage in interstate commerce at gun shows.

**(23)**  **NYS PL § 400.00 (8)**

**(a)**      A gunsmith or dealer of firearms may conduct business temporarily at a location other than the location specified on the license if such temporary location is the location for a gun show or event sponsored by any national, state, or local organization, or any affiliate of any such organization devoted to the collection, competitive use or other sporting use of firearms.

**82.** And 27 C.F.R. § 478.50 (a) allows Knight and/or FFL 01s to utilize off-site storage locations of inventory. And 38 R.C.N.Y. § 4-03 (k) indicates that inventory can be stored at branch units throughout New York City. **Exhibit 19**

**(24)** **38 R.C.N.Y. § 4-03 (k)**

**(a)** If applicant has any *branch units* in the City of New York where any firearms, rifles, shotguns, machine-guns, assault weapons, air pistols, or air rifles are stored or any activities requiring a license are conducted, a separate application shall be filed with the precinct where each *branch* is located and a separate license secured for each premises.

**83.** 38 R.C.N.Y. § 4-03 violates the *Supremacy Clause*, Defendants have ignored Knight's written requests for an amended state FDL application that is equally applicable to Knight and/or all FFL 01s, who intend to sell handguns intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce under NYS PL § 400.00 (1-a). 38 R.C.N.Y. and/or NYC Admin., Code discriminates against interstate commerce in favor of local businesses. It allows FFL 01s with a brick & mortar store in New York City to only sell firearms from their store. But prohibits Knight and all FFL 01s from selling any firearms intrastate at gun shows or intrastate and/or interstate via mail-order and/or e-commerce.

**84.** Defendants have not been required to show that this *de-facto* ban on selling handguns and/or ammunition intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce supports a police power or public safety concern. Nor have they provided any proof that they are advancing any interest of which no other means exists to do so, see, *C & A Carbone, Inc. v. Clarkstown,* 511 U.S. 383 (1994), 511 US at 392. See, *Granholm v. Heald*, 544 U.S. 460, 473 (2005). This ban is thus *per se* invalid. **Ex 28 - No. 22**

85.     Once the Court determines discrimination against interstate commerce, it must then determine whether the law advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. If it does, then the law is constitutional; if not, the law is void. Importantly, this test is a high hurdle to clear. **It is so rarely overcome that the Court frequently refers to it as a virtually per se rule of invalidity**.

### (25)   State Firearm Dealer's License Application

86.     The state PPB-6: Application for License as Gunsmith - Dealer in Firearms in fifty-seven counties of the State of New York consists of a single document. Defendant's application for the same license is sixteen pages. And unlawfully mandates that all FFL 01s must possess a brick & mortar store in New York City before they can apply for a state FDL to conduct business. **Exhibit 20**

87.     Requiring FFL 01s to possess a brick & mortar store does not exist within the other fifty-seven counties in the State of New York because it's preempted by NYS PL § 400.00 (1-a). Defendant's state FDL application should be uniform with the PPB-6 application issued throughout the entire state to support the Legislature's intent to preempt the field of firearms regulation under NYS PL § 400.00 (1-a).

> (a)     The 1st Amendment protects both book buyers and booksellers. Does the Second Amendment protect only people who buy guns, or does it also protect people who sell guns? Though this question has divided the federal courts, the answer is quite clear: operating a business that provides 2nd Amendment services is protected by the 2nd Amendment. *Heller* teaches that regulation of how firearms are commercially sold enjoys a presumption of constitutionality, which does not extend to prohibitions of firearms sales. See, *Does the Second Amendment Protect Firearms Commerce*? David B. Kopel. **Exhibit 21**

88.     The Supreme Court has long held that the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, *Healy v. Beer Inst., Inc*., 491 U.S. 324, 336 (1989), and imposes strict limitations on states power to discriminate against interstate commerce, *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). These restrictions apply to states and political subdivisions alike. *Maine v. Taylor*, 477 U.S. 131, 151 (1986). **Ex 28 - No. 23**

89.     There is no doubt that Defendant's prohibition implicates commerce, both inside and outside of New York City. By completely prohibiting interstate commerce outside of the city and/or state and it is long settled that the prohibition of interstate commerce is a form of regulation. See, *Champion v. Ames* (*Lottery Case*), 188 U.S. 321 (1903). **Ex 28 - No. 24**

90.     Defendant's denial is duplicative of *New York State Rifle & Pistol Ass'n. v. City of New York*, 140 S. Ct. 1525 (2020). For seven years Defendants fought to prohibit the transportation of firearms out of New York City citing public safety concerns. On January 22, 2019, the U.S. Supreme Court granted Certiorari, and Defendant's moved to amend their rule.

91.     Why did they voluntarily walk back their firearms transport rule if doing so would threaten public safety? If changing this rule did not impact public safety, why did the rule exist in the first place? They recognized that U.S. Supreme Court likely would not agree to hear the *NYSRPA* case if they did not intend to reverse New York City's draconian firearms transport rule. **Ex 28 - No. 25**

**92.** Defendants cannot prohibit residents of New York City from transporting their firearms outside of the city any more than they can prohibit Knight and/or FFL 01s from receiving inventory and transporting it to gun shows and/or off-site storage locations outside of New York City under 27 C.F.R. § 478.50 (a). Nor can they prohibit Knight and/or FFL 01s from selling their constitutionally protected goods and/or services intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce to law-abiding citizens throughout the country.

**93.** The U.S. Department of Justice has stated that when there is a conflict between federal firearm laws all provisions of the GCA and the NFA, and their corresponding regulations, continue to apply. Defendants cannot bypass federal firearms regulations to prohibit Knight and/or FFL 01s from selling their constitutionally protected goods and or services to law-abiding citizens intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce.

**94.** By purporting to nullify federal law, 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) violate the *Supremacy Clause* of the U.S. Constitution see, U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); see *United States v. Reynolds*, 235 U.S. 133, 149 (1914) ("If such state statutes . . . have the effect . . . to nullify statutes passed in pursuance [to the Federal Constitution], they must fail."). **Ex 28 - No. 26**

**95.**     As the U.S. Supreme Court has made clear on many occasions, state legislatures have no authority to invalidate federal statutes or to disregard federal law. *See*, e.g., *Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958) (reaffirming the "basic principle that the federal judiciary," not an individual State, "is supreme in the exposition of the law of the Constitution"); *U.S. v. Reynolds*, 235 U.S. 133, 149 (1914) ("If such state statutes . . . have the effect to deny rights secured by the Federal Constitution or to nullify statutes passed in pursuance thereto, they must fail."); *Anderson v. Carkins*, 135 U.S. 483, 490 (1890) ("The law of congress is paramount; it cannot be nullified by direct act of any state, nor the scope and effect of its provisions set at naught indirectly."); *Ableman v. Booth*, 62 U.S. (21 How.) 506, 523–26 (1858); *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809). **Ex 28 - No. 27**

**96.**     Additionally, under the doctrine of preemption, state law is invalid to the extent it conflicts with federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (conflict preemption includes both "cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). **Ex 28 - No. 28**

**97.**     Knights business is one with constitutionally protected goods and/or services that directly involve the 2nd Amendment. Defendants have superseded the authority of Congress to regulate interstate commerce in violation of the *Supremacy Clause*. NYS PL 400.00 (1-a) requires Knight and/or FFL 01s to possess a state FDL to sell handguns and/or ammunition.

**98.**     Why are Defendants prohibiting Knight a New York City PASSPort vendor from receiving a state FDL to sell handguns and/or ammunition to city agencies and/or law-abiding citizens intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce? This violates the constitutional right to *keep and bear arms* in public for self-defense.

> **(a)**     A government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen. The duty to provide public services is owed to the public at large, and, absent a special relationship between the police and an individual, *no specific legal duty exists*; See, *Warren v. District of Columbia*, (444 A.2d. 1, D.C. Ct. of Ap. 1981). **Ex 28 - No. 29**

## 8)     Protection For Businesses Providing Related Services

**99.**     Insofar as subject matter jurisdiction the doctrine of standing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). The minimal constitutional mandate for Article III standing must show **(1)** an injury-in-fact, **(2)** a causal connection between the injury and the conduct complained of, and **(3)** that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The economic injury caused by 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) is sufficient standing for Knight to challenge those statutes. *See*, *Nat'l Audubon Society v. Davis*, 144 F. Supp. 2d 1160 (N.D. Cal. 2000), 307 F.3d 835, 855-56, opinion amended in other respects on denial of reh'g, 312 F.3d 416 (9th Cir. 2002). In *Davis*, for example, plaintiff animal trappers challenged a law prohibiting the use of certain types of traps. 307 F.3d at 842. **Ex 28 - No. 30**

**100.** The trappers alleged that they earned a living through trapping, had ceased trapping because of the law, would continue trapping if the law were declared invalid, and asked for declaratory and injunctive relief. *Id*. At 845, 855-56. The Court concluded that the trappers had the standing to challenge the law, noting that the trapper's economic injury is directly traceable to the fact that [the challenged law] explicitly forbids the trapping they would otherwise do *Id*. at 856.

**101.** [The] irreducible constitutional minimum of standing requires a showing of an economic *injury-in-fact* that is fairly traceable to the challenged action and likely [to] be redressed by a favorable decision. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 591 (8th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "A law that is facially discriminatory or has discriminatory effects is unconstitutional whether or not it also was the product of a discriminatory purpose." See, *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth*., 550 U.S. 330, 338 (2007). There is simply no denying that Defendant's regime is discriminatory *facially* and *as applied* to Knight and/or FFL 01s. In the 1st Amendment context, [l]iberty of circulating is as essential to [freedom of expression] as liberty of publishing; indeed, without the circulation, the publication would be of little value. See, *City of Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 768 (1988) (citing Ex parte *Jackson*, 96 U.S. 727, 733 (1878)); see, also *Lovell v. City of Griffin, Ga*., 303 U.S. 444, 452 (1938). **Ex 28 - No. 31**

**102.**   In _Carey v. Population Services International_, 431 U.S. 678, 684-88 (1977), the Supreme Court struck down a New York statute forbidding distribution of non-prescription contraceptives through anyone but a licensed pharmacist as unconstitutional, noting that a total prohibition against sale of contraceptives could have an even more devastating effect upon the right to choose to beget a child than a direct ban on contraceptives itself would. The 5th Circuit struck down a Texas statute prohibiting the promotion or sale of sexual devices because restricting the ability to purchase an item is tantamount to restricting that item's use. _Reliable Consultants, Inc. v. Earle_, 517 F.3d 738, 740, 743 (5th Cir. 2008). An 8th Circuit case found an ordinance restricting the sale of contraceptives and prophylactics was an unconstitutional burden on the right to contraception choice. See, _Postscript Enters., Inc. v. Whaley_, 658 F.2d 1249, 1252-53 (8th Cir. 1981). **Ex 29 - No. 32**

**103.**   But as with other protected rights, the 2nd Amendment right becomes meaningless. If Defendants can simply prohibit law-abiding citizens from exercising that right by preventing Knight and/or FFL 01s from selling their constitutionally protected goods and/or services in interstate commerce. Unless the conduct at issue is not protected by the 2nd Amendment, Defendants bear the burden of justifying the constitutional validity of 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) that impose a burden on interstate commerce by prohibiting law-abiding citizens from purchasing handguns (i.e. conduct falling within the scope of the 2nd Amendment's guarantee).

**104.** Knight's assertion of a right to conduct business is a legally cognizable one. See, *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n. 23 (1976). Knight's injuries are concrete and particularized because of 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) which makes it impossible for Knight and/or FFL 01s to conduct business, with any law-abiding citizens affecting them in a personal and individual way. *Lujan*, 504 U.S. at 560 n.1. Imagine that, to enforce state anti-obscenity laws, Congress outlawed the interstate sale of books. No Court would uphold such a law. Laws that impose broad, categorical bans rather than narrow, precise restrictions are by definition not narrowly tailored. And that is whether the government bans books or firearms. See, e.g., *Sable Commc's of Cal., Inc. v. FCC*, 492 U.S. 115, 128 (1989) ("The federal parties argue that the total ban on indecent commercial telephone communications is justified because nothing less could prevent children from gaining access to such messages. We find the argument quite unpersuasive;") *Id*. at 131 (describing the ban as "another case of 'burn[ing] the house to roast the pig'") (quoting *Butler v. Michigan*, 352 U.S. 380, 383 (1957)). **Ex 29 - No. 33**

### (26)   3rd Party Constitutional Rights of Gun Stores Customers

**105.** Supreme Court precedent dictates that gun stores may assert the 3rd party constitutional rights of their customers. The cited foundational modern case for this rule is, *Craig v. Boren*, 429 U.S. 190 (1976) (liquor stores may assert equal protection rights of their customers, against state law which set different legal ages for alcohol purchases, based on the sex of the customer). **Ex 29 - No. 34**

**106.**    The doctrine dates back at least to _Pierce v. Society of Sisters_, 268 U.S. 510 (1925) (operators of religious schools may assert the 14th Amendment rights of their customers to guide their children's education; ban on all non-government K-12 schools held invalid). Knight in any event independently has established 3rd party standing. He suffers an _injury in fact_ since the challenged statutory provisions are addressed to FFL 01s like Knight, who either must obey the statutory provisions and incur economic injury or disobey the statute and suffer sanctions. In such circumstances, vendors may resist efforts to restrict their operations by advocating the rights of third parties seeking access to their market. _See_, e.g., _Eisenstadt v. Baird_, 405 U. S. 438. Pp. 429 U.S. 194-197 (1972). **Ex 29 - No. 35**

### (27)    Subject Matter Jurisdiction

**107.**    Defendants originally averred that Knight failed to apply for a state FDL however we recognize that a litigant's failure to apply for a license may at times render his challenge to a licensing scheme unripe for judicial review. See, e.g., _Pacific Gas Elec. Co. v. State Energy Resources Conservation Dev. Comm'n_, 461 U.S. 190, 200-03 (1983). In many cases, requiring litigants to apply for a license before challenging a licensing scheme prevent[s] courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. _Id_. at 200 (quoting _Abbott Lab. v. Gardner_, 387 U.S. 136, 148-49 (1967)). **Ex 29 - No. 36**

**108.**     Litigants are not required to make such futile gestures to establish ripeness. *Hailes v. United Air Lines*, 464 F.2d 1006, 1008 (5th Cir. 1972); *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201-02 (2d Cir. 1977), cert. denied, 440 U.S. 979 (1979); see, also *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs,") compare *Newark Branch, NAACP v. Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990) (plaintiff organization's members have no standing to challenge discriminatory employment practice because there was no indication that any of the members was deterred by the practice from applying for a job). Recognizing there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the Pike [test], the Supreme Court has said, the critical consideration is the overall effect of the statute on both local and interstate activity, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth*, 476 U.S. 573, 579 (1986). **Ex 29 - No. 37**

**109.**     No applicant is required to apply knowing that the attempt would be futile. "While a plaintiff typically lacks standing to challenge NY State's licensing laws if he fails to apply for a firearms license in New York, there is an exception to this rule: a plaintiff who fails to apply for a firearms license in NY has standing if he makes a 'substantial showing' that his application 'would have been futile.'" See, *Doe v. Putnam Cnty.*, 344 F. Supp. 3d 518 (S.D.N.Y. 2018). **Ex 29 - No. 38**

**110.** "In an October 7, 2022 Order, the Court asked Defendants to address whether the Court was required to dismiss Knight's facial challenge to the licensing scheme. Defendants responded in a letter dated October 21, 2022, arguing that the Court did not have subject-matter jurisdiction to entertain a *facial* challenge to the gun-dealer rules and regulations because Knight lacked standing and the challenge was not ripe. At a conference with the parties on November 17, 2022, the Court pointed Defendants to case law suggesting that Knight might have standing to challenge the City's gun-dealer licensing scheme, even without having applied for such a license, because he claims that submitting such an application would have been futile. Defendants subsequently filed a letter on December 7, 2022, notifying the Court that they were partially withdrawing their motion to dismiss, to the extent it sought to dismiss any facial challenge by Knight to the City's gun-dealer licensing scheme. **Exhibit 22**

**(28)**   [42 U.S.C. § 1981: The Civil Rights Act of 1866](#)

**111.** *Includes the right to make contracts*, to own property, to sue in court, and enjoy the full protection of federal law. In the superseding opinion, reconsidering the Court's approach to the causation standard for § 1981 claims under *Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007), following the Supreme Court's decisions in *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167 (2009), and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), the panel held that a plaintiff need not plead that racial discrimination was the but-for cause of a defendant's conduct, but only that racial discrimination was a factor in the decision not to contract such that the plaintiff was denied the same right as a white citizen. **Ex 29 - No. 39**

112.   Defendants aver that handguns can only be purchased from a NYS Firearms Dealer however, handguns can be purchased via mail-order and/or e-commerce from any FFL 01 in any state. All law-abiding citizens can go to any dealer's e-commerce website and purchase firearms that are legal to possess within their home state. The e-commerce dealer would ship the firearm to a retail FFL 01 in the buyer's home state. The buyer would go to their retail FFL 01 and fill out an ATF Form 4473 and undergo an FBI background check this is known as a *transfer*. Defendants are prohibiting FFL 01s from making out-of-state handgun *transfers* to FFL 01s in other states this *facially* and *as applied* violates the Commerce Clause.

### (29)   Privileges and Immunities Clause of Article IV, Section 2

113.   Defendants, are requiring Knight and/or FFL 01s to locate an area zoned for a firearms dealer's business in the city. Then lease commercial space from an institutional investor or hedge fund in the city at a cost of thousands of dollars per month. Knight and/or FFL 01s have to lease a brick & mortar store before they can even submit a non-refundable fee to apply for a state FDL to sell handguns and/or ammunition in the city which would take six months to over a year to process.

114.   Knight and/or FFL 01s would be responsible for leasing a commercial space in New York City for upwards of one year. However, without possessing the required state FDL to conduct business Knight and/or FFL 01s would not make a profit for up to one year. Knight would not be able to sustain this lease. And after opening a brick & mortar store Defendants could still discretionally deny issuing Knight a state FDL. "No state shall convert a liberty into a license, and charge a fee, therefore." See, *Murdock v. Pennsylvania*, 319 U.S. 105 (1943). **Ex 29 - No. 40**

**115.** If NYC Admin Code § 10-302.1 (b) is not enjoined Knight and/or FFL 01s will never be able to acquire a state (FDL) without being forced by Defendants to possess a brick & mortar store in the city before applying for a state (FDL) to sell handguns and/or ammunition in interstate commerce in violation of NYS PL § 400.00 (1-a). The ability to pursue one's profession or common calling is one of the limited number of foundational rights protected under the Privileges and Immunities Clause of Article IV, Section 2. See, *Toomer v. Witsell*, 334 U.S. 385, 396 (1948); see also *United Bldg. & Constr. Trades Council v. Camden*, 465 U.S. 208, 219 (1984). ("Certainly, the pursuit of a common calling is one of the most 'fundamental of those privileges' protected by the Clause"). Indeed, "[m]any, if not most, of [the Supreme Court's] cases expounding the Privileges and Immunities Clause have dealt with this basic and essential activity." *Camden*, 465 U.S. at 219. **Ex 29 - No. 41**

**116.** Licensing statutes present a hurdle to entering the workforce because many requirements may be *too expensive*, time-consuming, arbitrary, or difficult for some aspirants to meet, locking them out of their intended profession. The Supreme Court has struck down state laws that infringed rights guaranteed by the Privileges and Immunities Clause of Article IV, Section 2 see, *Hicklin v. Orbeck*, 437 U.S. 518, 98 S. Ct. 2482, 57 L. Ed. 2d 397 (1978). **Ex 29 - No. 42**

**117.** As British subjects, colonial Americans believed that they shared equally in the enjoyment of this guarantee and that the right necessarily extended to commerce in firearms. Colonial law reflected such an understanding. For instance, in Virginia, all persons had "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." Laws of Va., Feb., 1676-77, Va. Stat. at Large, 2 Bening 403. It came as a shock, therefore, when the Crown sought to embargo all imports of firearms and ammunition into the colonies. 5 Acts Privy Council 401, reprinted in Connecticut Courant, Dec. 19, 1774, at 3.

**118.** The General Committee of South Carolina declared in response that "by the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them." 1 John Drayton, Memoirs of the American Revolution As Relating to the State of South Carolina 166 (1821) (internal quotation marks omitted). Such suspicions were not unwarranted. As war raged in 1777, Colonial Undersecretary William Knox recommended that the Americans, once conquered, be subdued, in part, by prohibiting their means of producing arms: "the Arms of all the People should be taken away ... nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence." Leland J. Bellot ed., William Knox Asks What is Fit to Be Done with America? in 1 Sources of American Independence 140, 176 (Howard H. Peckham ed., 1978).

**119.**    In ratifying the 2nd Amendment, the States sought to codify the English right to keep and to bear arms. See, _Heller_, 554 U.S. at 599, 128 S.Ct. 2783. The historical record indicates that Americans continued to believe that such right included the freedom to purchase and to sell weapons. In 1793, Thomas Jefferson noted that **"[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."** Thomas Jefferson, 3 Writings 558 (H.A. Washington ed., 1853).

**120.**    Indeed, as one commentator of the early Republic pondered, "What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece ...?" _Heller_, 554 U.S. at 583 n. 7 (quoting Some Considerations on the Game Laws 54 (1796). _Teixeira_, 822 F.3d at 1054-55.

**121.**    When considering the historical context of the 2nd Amendment in the late 18th Century, it is important to realize that _"Federalists and anti-Federalists alike had linked the preservation of liberty to an armed populace."_ Robert E. Shalhope, _The Armed Citizen in the Early Republic,_ 49 LAW & CONTEMP. PROBS. 125, 136 (1986). As Professor Shalhope explains, during this time period the drafters of the Bill of Rights _"firmly believed in two distinct principles:_ **(1)** individuals had the right to possess arms to defend themselves and their property, and **(2)** states retained the right to maintain militias composed of these individually-armed citizens." _Id._ at 133. Indeed, there is little quarrel with the notion that arms were ubiquitous in late 18th Century America whether for self-defense, defense of personal property, or hunting to feed one's family.

**122.**   How, then, did the inhabitants of agrarian America at this time acquire their arms? It was through the many gunsmiths and merchants located throughout the colonies who sold them, for at this time there were but a few companies devoted to the large-scale manufacture of arms.

**123.**   In the late 18th Century, when 95% of the population of colonial America lived on farms, available firearms largely consisted of "flintlock fowlers" long guns which served to put food on the table and to protect one's home and family from marauding Indians and/or enemy soldiers. See, Tom Grinslade, Eighteenth-Century American Fowlers the First Guns Made in America, AM. SOC'Y OF ARMS COLLECTORS BULL. 89:1-9 (Spring 2004). Pockets of firearm manufacturing gun-making shops or small factories developed in specific areas such as New England, the Hudson Valley, and Kentucky, where gunsmiths settled and began producing "fowlers" with distinctive features and characteristics. *Id*.

**124.**   Unlike modem times, gunsmiths and purveyors of firearms in the late l700 were free to engage in commerce in arms with other colonists without restriction. In his extensive historical survey of American firearm laws dating back to colonial times, which purportedly included a review of over 1,000 laws falling into 20 different categories, such as brandishing laws, gun carry restrictions, firing local restrictions, and registration and taxation, Professor Richard Spitzer does not cite a single firearm sales law which regulated, barred or licensed sales in the 18th Century (or the 19th Century for that matter). Robert J. Spitzer, Gun History and Second Amendment Rights, 80 LAW & CONTEMP.PROBS. 55, 75 (2017).

**125.** The earliest such law cited was a Georgia law from 1902. *Id*. Thus, the ubiquitous nature of firearms and unregulated commerce in arms in colonial America supports the view that the right to sell firearms whether freestanding or ancillary is implicit in the 2nd Amendment.

### Jonathan Zeron v. Dermot F. Shea, et al., No. 154821/2020

**126.** Mr. Zeron resides in Westchester County., NY. He possesses an FFL 01 a state FDL and a Westchester County Pistol Permit (Carry Concealed). He applied for a Special Carry License from the Defendants as an addendum to his Westchester County Pistol Permit (Carry Concealed). *See*, *Jonathan Zeron v. Dermot F. Shea*, et al., Index No. 154821/2020. **Ex 29 - No. 43**

    **(a)** The Special Carry License is valid for the business name, address and handguns listed on the license, only while the licensee has in his possession a valid carry county license issued according to the provisions of article 400 of the N.Y.S. Penal law. Upon the revocation, suspension, or cancellation of the basic county license, the Special Carry License is rendered void and must be immediately returned to the License Division.

**127.** Upon applying for his Special Carry License to conduct business within New York City, Defendants implied that Mr. Zeron needed to open a brick & mortar store and then apply for a state FDL in New York City. Although he already possessed a New York State (NYS) Dealer in Firearms license in Westchester County.

**(a)**      Mr. Zeron is a gun dealer. He has a Federal Firearms license and a New York State (NYS) Dealer in Firearms license issued in Westchester County. He seeks a Special Carry license to carry a gun for self-protection while engaging in gun dealing in New York City (NYC) (e.g., buying, selling, and transporting guns). However, a Firearm Dealer license issued in NYC by the NYC Licensing Officer is required in order to engage in gun-dealing in NYC. Mr. Zeron has no such license, and, therefore, he cannot do so. Accordingly, Mr. Zeron does not have proper cause for the requested license since the activity for which he seeks protection is unauthorized see, Verified Answer. **Exhibit 23 p. 39**

**(30)** [**ATF: Report of Active Firearm Licenses**]

128.      There are (62) counties within the State; according to Defendant's place of business requirements. Every FFL 01 in the city would require one state FDL and one brick & mortar store in New York City, and one additional state FDL and store within each of the other fifty-seven counties in the state for a total of fifty-eight stores. Defendants aver that an FFL 01 is invalid unless every FFL 01 holder in the country opens a brick & mortar store within New York City. There are nine different types of federal licenses totaling 134,012 throughout the country. Of this group, if all 51,579 FFL 01s wanted to conduct business within New York City where would all 51,579 brick & mortar stores be located? This is an egregious violation of the Commerce Clause and an Article III economic *injury-in-fact*. Which consists of 51,000+ FFL 01s outside of the city who cannot engage in interstate commerce with FFL 01s and/or law-abiding citizens within New York City. **Exhibit 24**

**(31)   Brick & Mortar Closures**

**(a)**     As humans, we love using stories to explain the world around us. The problem is that the real world is often far more complicated than can be captured in one story.

**(b)     In 2017 alone, there's been a rash of brick-and-mortars throwing in the white flag either by filing for bankruptcy, closing stores, or missing crucial debt payments**.

**(c)**     Here's what the carnage has looked like:

**1)     January:**

- **American Apparel** shuts down 110 stores, lays off 2,400.
- **Limited** closes 250 stores.

**2)     February:**

- **Wet Seal** closes all stores.
- **Eastern Outfitters** declares bankruptcy.
- **Michigan Sporting Goods** closes 68 stores, lays off 1,300.

**3)     March:**

- **HHGregg** files for bankruptcy, closes 88 stores, lays off 1,500.
- **RadioShack** files for bankruptcy (again) and closes 200 stores.
- **Gander Mountain** files for bankruptcy, closes 32 stores.
- **Gordmans Stores** files for bankruptcy.

**4)     April:**

- **Payless Shoes** files for bankruptcy and will close 200 stores.
- **Rue21** misses debt payments, is said to be considering bankruptcy.
- **Marsh Supermarkets** stops paying rent on six of its locations.
- **Neiman Marcus** announces it is not paying interest on a bond to preserve cash.
- **Bebe** will close all 180 of its locations.

**(d)**     In the face of such a shocking number of closures, there's one narrative that we hear over and over again: e-commerce, particularly the presence of Amazon (NASDAQ:AMZN), is ushering in the death of brick-and-mortar locations. **Exhibit 25**

**9)**   **Waiting Periods are Unconstitutional**

**129.**   It would be cost-prohibitive for Knight and/or many FFL 01s to acquire inventory to stock a brick & mortar store. Whereas Defendants prohibit FFL 01s from keeping handguns on open display within their store and only allow handgun license holders to purchase one handgun (i.e., Handgun Purchase Authorization) every ninety days to unconstitutionally limit firearm sales to law-abiding citizens.

> **(a)**   "[T]he right of the people to *keep and bear arms*" means nothing if the government can prohibit all persons from acquiring a handgun. Law-abiding citizens can only obtain one handgun by requesting government permission. If their request is approved they can only purchase one handgun per authorization every ninety days. How can an FFL 01 sustain a business if every customer can only purchase one handgun in interstate commerce every ninety days or four times a year?

**130.**   Under NYC Admin Code 10-302.1 (b) purchasing another handgun can take six months. Applicants can only request one Handgun Purchase Authorization every ninety days and this request takes six weeks to process. If approved a handgun must be purchased within thirty days. If no handgun is purchased the licensee can request a thirty-day extension which requires returning the purchase authorization by hand and receiving a new one. If the authorization form is not returned by hand the handgun license will be suspended, revoked, and/or canceled. After purchase, the applicant has to make an appointment to have the handgun inspected by the NYPD LD before the handgun can be transported to a range or carried in public. Arbitrary waiting periods are a violation of the 2nd Amendment right of all law-abiding citizens who intend to acquire handguns for self-defense in the city. Defendants have not provided any public safety reason for this ninety-day waiting period or narrowly tailored this process so that it does not violate the 2nd Amendment. **Exhibit 26**

| Application Investigation | Waiting Period | 6 Months |
|---|---|---|
| 1st Purchase Authorization Issued With License | N/A | N/A |
| 2nd Purchase Authorization | Waiting Period | 90 Days |
| Purchase Authorization - Processing Time | Waiting Period | 6 Weeks |
| Inspection Appointment | Waiting Period | 1 - 2 Months |
| | Possible - Total | 12 Months |

**131.**   "First, the Orders "implicate[d] the core of the 2nd Amendment right"
because they foreclosed the ability to acquire arms and ammunition and maintain
proficiency in the use of firearms rights which an en banc panel of this Court has
repeatedly acknowledged are "necessary to the realization of the core right to possess
a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 677 (9th Cir. 2017);
see *also id.* ("As with *purchasing ammunition* and *maintaining proficiency in
firearms use*, the core 2nd Amendment right to *keep and bear arms* for self-defense
wouldn't mean much without the *ability to acquire arms*." (emphases added) (citation
and internal quotations omitted)); see *also id.* at 680 ("[G]un buyers have no right to
have a gun store in a particular location, *at least as long as their access is not
meaningfully constrained*." (emphasis added)); *id.* at 682 ("Commerce in firearms is a
necessary prerequisite to keeping and possessing arms for self-defense . . . .")." **Ex 29
- No. 44**

**132.**   "If these rights are "necessary to the realization of the core 2nd Amendment rights," *id.* at 677, then a *fortiori* they must "implicate[] the core of the 2nd Amendment." *Silvester*, 843 F.3d at 821. See, *McDougall v. Cnty. of Ventura,* No. 20-56220 (9th Cir. Jan. 20, 2022). On the merits, the LA County Orders (Orders) both burdened conduct protected by the 2nd Amendment and fail strict and intermediate scrutiny. See *McDougall,* __F.4th at __. While the 11-day mandated closure at issue here is shorter than the 48-day closure at issue in *McDougall*, 11 days instantly becomes 21 days when adding California's 10-day waiting period for acquiring firearms. See, *Silvester v. Harris*, 843 F.3d 816, 819 (9th Cir. 2016). **Ex 29 - No. 45**

**133.**   "And a 21-day delay for acquiring a firearm is more than double the delay considered in *Silvester*. *Id.* Moreover, an 11-day total ban on law-abiding citizens' ability to practice with firearms at firing ranges or acquire firearms and ammunition *at all* which the Orders clearly indicated could be perpetually extended if the County so decided severely burdens the core of the 2nd Amendment right at a time of crisis, precisely when the need to exercise that right becomes most acute. See *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Statement of Gorsuch, J.) ("Even in times of crisis perhaps especially in times of crisis we have a duty to hold governments to the Constitution."). See, *Martinez v. Villanueva*, No. 20-56233 (2022)." **Ex 29 - No. 46**

**(a)**    Waiting periods are arbitrary impositions with no effect on crime or suicide, introduce no additional investigative avenues, and only burden law-abiding gun owners without changing how or when criminals obtain firearms.

**(b)**    Waiting periods do not change the background check process; no additional investigative measures are taken no matter how long of a waiting period is imposed. Most background checks are resolved instantly, but investigations can currently last up to ninety days.

**(c)**    There is no evidence that waiting periods reduce suicides, homicides, or mass shootings. No studies that identify causal effects have been identified by any of the independent literature reviews conducted since 2004.

**(d)**    Recent research that purports to find that waiting periods reduce firearm-related deaths is fundamentally flawed, as it also finds that background checks increase gun homicides and that poverty is associated with a decrease in homicides.

**(e)**    The average time-to-crime for firearms traced by the BATFE in 2018 was nearly nine years, so the idea that guns are often used in crimes of passion or impulsive actions right after purchase is not supported by anything other than anecdotal evidence.

**(f)**    Criminals will not be affected by waiting periods. Most state inmates who were in possession of a firearm at the time of their arrest obtained the firearm through an illegal source or from a friend or family member.

**(g)**    There are few prosecutions of prohibited persons who attempt to buy a firearm from a dealer. Out of 112,090 total federal denials in 2017, there were 12 prosecutions.

**(h)**    The waiting period mandated by the Brady Act of 1993 was only in effect until the National Instant Check System came online in 1998.

**(i)**    Most gun-owners own more than one firearm and a waiting period could not possibly have an effect on those purchasing an additional firearm. First-time buyers seeking a firearm for self-defense would be affected by a waiting period that limits their ability to safeguard themselves and their loved ones.

**134.**   Waiting periods were once part of federal law, mandated by the Brady Handgun Violence Prevention Act of 1993 but only until the National Instant Criminal Check (NICS) came online in 1998. The five-day waiting period mandated under the Brady Bill was replaced with the instant check system.

**135.**   While most checks are instant, the FBI has three days to complete the background check before the transfer can proceed. The investigation can continue well past three days and, in cases in which the firearm was transferred after the three-day window, the case is referred to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATFE) for retrieval of the firearm.

**136.**   Arguments for waiting periods focus on two easily disproven claims: waiting periods allow more time for the background investigation and allow for a cooling-off period. There is no evidence to support either claim.

**137.**   First, the mechanism of the background check is not altered in the presence of a waiting period. The FBI would still run the prospective buyer's information against the same databases containing the same information they do now. Most buyers will continue to be approved instantly, and those who are flagged for additional investigation will still be flagged for additional investigation. The investigation itself remains the same and can continue for 90 days when the data is required to be destroyed. No additional information will be uncovered with the addition of a waiting period on top of the existing three-day delay.

**138.**   In increasingly rare cases in which the initial check is delayed and the firearm is transferred after three days and then the buyer is determined to be prohibited, the FBI refers the case to the ATF for retrieval of the firearm. In 2018, the FBI forwarded 4,240 background check denials to the ATF that potentially involved firearm retrieval.

**139.**   In 2017, approximately 25.6 million firearm-related background checks were processed through NICS and about 181,000 – or 1% - were denied because the person was prohibited under federal or state law. More than 89% of federal NICS checks were resolved immediately in 2018, though this is down from 2014. There was no need for investigation in 89% of federal NICS checks. The FBI estimates that out of 100 potential gun buyers, 70 checks are resolved immediately and 30 are transferred to the NICS section for follow-up. Of those 30, 20 are completed after the initial delay and 10 are delayed for additional research. On average, there will be 1.21 denials for every 100 background checks conducted.

**140.**   Prohibited persons who attempt to buy a firearm from a dealer are rarely prosecuted. Federal denials accounted for 112,090 of the total 181,000 denials in 2017 (the others occurred in point of contact states). The ATF Field Divisions investigated 12,710 of these cases and United States Attorney's Offices prosecuted 12 cases. Between 10% and 21% of people investigated by the ATF were later arrested for a crime involving guns. Ten of the thirteen point of contact states do not investigate or prosecute NICS denials, though some may refer the cases to local law enforcement for investigation.

141.     Oregon, Pennsylvania, and Virginia are the only point of contact states that investigate a high proportion of firearms purchase denials. Proponents of the waiting period claim it is a cooling-off period that supposedly gives the prospective buyers time to reconsider their intentions and protect against impulsive actions. This argument has no logical basis. Two-thirds of gun owners own more than one gun. A cooling-off period for these gun owners could not possibly have an effect as they already own other firearms. Anecdotal evidence about a person who purchases a firearm and then immediately uses it to harm themselves or somebody else are just that: anecdotal. There is no scientific evidence that waiting periods have any effect on suicide, homicide, or mass shootings.

142.     During September 30, 1993, hearings on the Brady Bill before the House Judiciary Committee Subcommittee on Crime and Criminal Justice, Assistant Attorney General Eleanor Acheson testified for the Department of Justice that there were no statistics suggesting that a large percentage of guns used in crime were used in those crimes within a few days or week of their purchase, much less in a moment of passion.

143.     A study of California handgun buyers published in 1999 found that the risk of suicide utilizing a firearm among gun buyers in the first week was 57 times as high as the adjusted rate in the general population and this is the first week after the 15 days between the purchase application and receipt of the handgun. The authors concluded that "The increase in the risk of suicide by firearm is apparent within a week after the purchase of a handgun and persists for at least six years."

**144.**  No Effect on Crime. In 2017, the national average time-to-crime of traced firearms was 8.8 years. Only about 6.5% of successfully traced firearms were used in a crime within the first three months of the retail purchase.

**145.**  Few state prison inmates who possessed a firearm at the time of their arrest legally purchases the firearm from a retail store (7.5%), pawnshop (1.6%), flea market (0.4%), or gun show (0.8%). Most acquired the gun off the street or from a drug dealer (43.2%) or through theft (6.4%). An additional 25.3% acquired the gun from a friend or family member.

**146.**  The Lack of Scientific Evidence. Independent reviews of the scientific literature have repeatedly deemed the evidence on the effect of waiting periods to be inconclusive.

**147.**  In 2003, the Centers for Disease Control published the findings of the Task Force on Community Preventive Services Regarding Firearms Laws and Prevention of Violence. They found insufficient evidence to determine the effectiveness of waiting periods for firearm acquisition. The evidence is insufficient because of a small number of studies, inconsistent evidence of effectiveness, and limitations in the design and execution of available studies. The apparent reduction in rates of firearms suicides among persons aged >55 years, associated with the interim Brady Law, is attributable to waiting periods in the interim law. It should be noted that this review did not exclude any studies for having a weak methodology.

148.    The National Research Council conducted a similar review in 2004. This included a review of a Ludwig and Cook study from 2000 that found no significant differences in homicide and suicide rates between the treatment and control groups, though they did find a reduction in gun suicides among persons age 55 and older in the treatment states. The treatment was the implementation of the Brady Bill; the control group was the states that already had equivalent legislation about background checks and waiting periods. A later version of the Ludwig and Cook study did not meet the eligibility requirements for synthesis of research conducted by Rand, discussed below.

149.    Robert A. Hahn was the lead author of a review of firearms laws and their effects in 2005. Hahn, et al., found the evidence of the effect of waiting periods on suicides inconclusive and found insufficient evidence for determining the effectiveness on violent crime.

150.    Earlier this year, the Rand Corporation published **The Science of Gun Policy**, a systemic review of firearm-related studies published since 2003. Rand's methodology only allowed for studies that were designed to identify causal effects among observed associations between policies and outcomes. Rand identified no qualifying studies that estimated the effects of waiting periods on suicides.

**151.**    A single study on the effect of waiting periods on violent crime and intimate partner homicide was identified, but the evidence was determined to be inconclusive. Based on this one study and an assessment of its strengths, Rand found no conclusive evidence for the effect of waiting periods on violent crime generally or intimate partner homicide in particular.

**152.**    Rand identified two studies that estimated the effects of waiting periods on mass shootings but deemed the evidence inconclusive. One study found the length of waiting periods to have uncertain effects on the likelihood that at least one mass shooting occurred in a state. The other found a suggestive effect consistent with the passage of any waiting-period law increasing the incidence of mass shootings. There were methodological concerns with both studies and so the evidence is inconclusive.

**153.**    A more recent study by a trio of authors from Harvard Business School claims to have found that waiting periods reduce gun deaths by 17%. Their model fails to incorporate controls for educational attainment, crime rates, police resources, and incarceration rates control used by virtually every other researcher studying firearms-related policy effects. This study did find that waiting periods reduce all homicides and suicides, as well as specifically firearms-related suicides but found that background checks increase homicides. The authors also found that poverty decreased firearm-related homicides and that poverty, urban areas, and younger aged cohorts were not associated with total homicides. The model is misspecified, but the finding was run across popular media with no mention of the effect of background checks.

**CLAIMS FOR RELIEF**

**1st CAUSE OF ACTION - [42 U.S.C. § 1983]**
**CIVIL ACTION FOR DEPRIVATION OF RIGHTS**

**154.**  Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**155.**  38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5), and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) individually and collectively substantially burden and violate the pre-existing individual rights protected by the U.S. Constitution to wit the deprivation of any rights, privileges or immunities secured by the U.S. Constitution and federal laws;

**156.**  38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) should be enjoined and stricken as unconstitutional *facially*, and *as applied* to Knight and/or FFL 01s in violation of preexisting rights protected by the U.S. Constitution;

**157.**  Knight, FFL 01s, and/or all law-abiding citizens are entitled to declaratory, preliminary, and permanent injunctive relief against such laws, customs, policies, and practices, that infringe on the *right to keep and bear arms* in public for self-defense in these ways, whereas the laws and regulations discussed in the foregoing allegations violate 18 U.S.C. § 242, 42 U.S.C. § 1981, 42 U.S.C. § 1983, the 2nd Amendment, the Commerce Clause, 3rd party standing, NY Civil Rights Law § 4, the Due Process and Equal Protection Clauses of the 14th Amendment, the Privileges and Immunities Clause of Article IV, Section 2, the U.S. Constitution and are an Article III *injury in fact* and are therefore invalid.

## 2nd CAUSE OF ACTION - [18 U.S.C. § 242]
## DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

**158.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**159.**   Ninety-day waiting periods prohibit law-abiding citizens from purchasing more than one handgun at any given time. And limiting handgun purchases to one handgun every ninety days is not a police power or public safety concern and serves no lawful purpose;

**160.**   If the *core* of the 2nd Amendment right to possess handguns is self-defense which promotes public safety. Then prohibiting FFL 01s from selling handguns and/or ammunition to law-abiding citizens in intrastate and/or interstate commerce via ninety-day waiting periods would contradict the government's transcendent interest in promoting public safety;

## 3rd CAUSE OF ACTION - [18 U.S.C. § 242]
## DEPRIVATION OF RIGHTS UNDER COLOR OF LAW

**161.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**162.**   FFL 01s are being injured, in fact, by Defendant's enforcement of 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) prohibiting FFL 01s from receiving inventory and selling handguns and/or ammunition in intrastate and/or interstate commerce. NYC Admin., Code 10-302.1 (b) prohibits law-abiding citizens from acquiring constitutionally protected goods (i.e., handguns) by limiting their purchase to only one every ninety days, strikes at the core of the 2nd Amendment right to *keep and bear arms* in public for self-defense.

**4th CAUSE OF ACTION - [Article 1, Section 8, Clause 3]**
**COMMERCE CLAUSE**

**163.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**164.**   Prohibiting Knight and/or all FFL 01s in the city from selling their constitutionally protected goods and/or services intrastate at gun shows and intrastate and/or interstate via mail-order and e-commerce. Prohibits Knight and/or FFL 01s from selling handguns and/or ammunition to law-abiding citizens in interstate commerce, and prohibits the transportation of inventory to off-site storage locations throughout the country in violation of **27 C.F.R. § 478.50 (a)**. And also prohibits Knight from bidding on contracts as a New York City PASSPort vendor with a commodity of 384 - Law Enforcement Equipment and Supplies.

**5th CAUSE OF ACTION - [3rd PARTY STANDING]**
**3rd PARTY STANDING OF FFL 01 CUSTOMERS**

**165.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**166.**   Prohibiting Knight and/or all FFL 01s in the city from selling their constitutionally protected goods and/or services intrastate at gun shows and intrastate and/or interstate via mail-order and e-commerce. Prohibits FFL 01s from selling handguns and/or ammunition to law-abiding citizens inside and/or outside of the State of New York. This violates the 3rd party rights of all FFL 01s customers who are law-abiding citizens that cannot purchase handguns for self-defense from Knight and/or FFL 01s in New York City striking at the core of the 2nd Amendment right to *keep and bear arms* for self-defense in public.

### 6th CAUSE OF ACTION - [NY Civil Rights Law § 4]
### RIGHT TO KEEP AND BEAR ARMS

**167.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**168.**   38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b), individually and collectively substantially burden and violate the pre-existing individual right protected by NY Civil Rights Law § 4, to wit, the right of law-abiding citizens to *keep and bear arms* in public for self-defense;

**(a)**   A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed.

### 7th CAUSE OF ACTION - [Article III, Section 2, Clause 1]
### EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT

**169.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**170.**   By only issuing a state FDL to FFL 01s with a brick & mortar store in New York City while refusing to issue a state FDL to FFL 01s who intend to sell constitutionally protected goods and/or services intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce, and prohibiting the transportation of inventory to off-site storage locations, and prohibiting Knight from making contracts with New York City as a PASSPort vendor with a commodity of 384 - Law Enforcement Equipment and Supplies.

## 8th CAUSE OF ACTION - [42 U.S.C. § 1981]
## EQUAL RIGHTS UNDER THE LAW

**171.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**172.**   38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b), individually and collectively substantially burden and violate the pre-existing individual right protected by the Civil Rights Act of 1866, to wit, the right to make contracts, to own property, to sue in court, and enjoy the full protection of federal law;

## 9th CAUSE OF ACTION - [14th Amendment]
## PROCEDURAL DUE PROCESS OF THE 14th AMENDMENT

**173.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**174.**   Defendants refuse to create a state FDL application equally applicable to all FFL 01s under the Equal Protection Clause of the 14th Amendment (i.e., PPB-6: Application for License as Gunsmith - Dealer in Firearms) **Exhibit 20**;

**175.**   Even after Defendants admitted that Knight was correct on the merits. "Upon review of the Court's orders and the filings herein, the City respectfully partially withdraws its motion to dismiss to the extent that it withdraws its argument that the Court lacks jurisdiction to entertain Plaintiff's facial challenge to the gun dealer licensing regulation 38 - RCNY § 4-03 (t)(3) (requiring gun dealer license applicants to possess a Certificate of Occupancy for a premise zoned for a gun dealers business." **Exhibit 08**

## 10th CAUSE OF ACTION - [Article III, Section 2, Clause 1]
### ARTICLE III ECONOMIC INJURY-IN-FACT

**176.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**177.**   Refusing to amend the application for a state FDL to make it equally applicable to all FFL 01s without a brick & mortar store who can sell constitutionally protected goods and/or services to New York City. This prohibits Knight from making contracts as a PASSPort vendor with any city agencies seeking Knights commodity of 384 - Law Enforcement Equipment and Supplies;

**178.**   Prohibiting Knight and/or FFL 01s from transporting inventory to off-site storage and selling their constitutionally protected goods and/or services intrastate at gun shows or intrastate and/or interstate via mail-order and e-commerce to law-abiding citizens strikes at the core of the 2nd Amendment right to *keep and bear arms* for self-defense in public.

## 11th CAUSE OF ACTION - [Article IV, Section 2]
### PRIVILEGES AND IMMUNITIES CLAUSE

**179.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**180.**   Only issuing a state FDL to FFL 01s with a brick & mortar store in the city while refusing to amend the application for a state FDL to make it equally applicable to all FFL 01s who can sell handguns and/or ammunition intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce to law-abiding citizens, or making contracts as a PASSPort vendor, and prohibiting Knight and/or FFL 01s from transporting inventory to off-site storage locations.

## 12th CAUSE OF ACTION - [State Preemption]
## STATE PREEMPTION

**181.**   Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint;

**182.**   NYS PL § 400.00 is the exclusive statutory mechanism for firearm licensing in New York State; 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) are preempted by NYS PL § 400.00 and should be declared nullities;

**183.**   Where the State has preempted the field, a local law regulating the same subject matter (i.e., 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b) are deemed inconsistent with the State's transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute" (*Albany Area Bldrs. Assn. v Town of Guilderland*, 74 NY2d at 377). Thus, when the Legislature has demonstrated its intent to preempt the field, all local ordinances are preempted, regardless of whether they actually conflict with the State Law (*id.*; see *Jancyn Mfg. Corp. v County of Suffolk*, 71 NY2d at 97; *People v De Jesus*, 54 NY2d at 468-470; *Matter of Ames v Smoot*, 98 AD2d at 217-219). Accordingly, in light of the comprehensive and detailed regulatory language and scheme of Penal Law § 400.00, which demonstrates the Legislature's intent to preempt the field of firearm regulation, we find that it preempts the amended ordinance. See, *Chwick v. Mulvey*, NY Slip Op 09911 (2010).

## PRAYER FOR RELIEF

**WHEREFORE**, judgment should be entered in Plaintiff's favor and against Defendants as follows;

184.   An ORDER enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from enforcing all related laws, regulations, policies, practices, and customs that would impede or criminalize the exercise of the right to *keep and bear arms*, in its entirety, or to the extent that 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b), individually and collectively; prohibits Knight and/or FFL 01s from transporting inventory to off-site storage, and requires a brick & mortar store as a prerequisite to apply for a state FDL to sell handguns and/or ammunition intrastate at gun shows and intrastate and/or interstate via mail-order and/or e-commerce; and prohibits Knight from bidding on contracts as a PASSPort vendor;

185.   Enter a declaratory judgment that 38 - R.C.N.Y. § 4-03 (k), (t)(1)(3)(4)(5) and/or NYC Admin., Code § 10-302 (c)(1) and 10-302.1 (b), are unconstitutional *facially* and *as applied* by prohibiting the acquisition, of handguns that are in common use for lawful purposes, (i.e., right to *keep and bear arms* for self-defense);

186.   Issue a state FDL applicable to all FFL 01s who intend to sell handguns in interstate commerce under the Equal Protection Clause of the 14th Amendment;

187.   All reasonable attorney's fees, costs, and expenses under 42 - U.S.C. § 1988, or any other applicable laws;

188.   An award of all remedies available under 42 - U.S.C. § 1983; and grant any such other and further relief as the court may deem proper.

Dated:       January 25, 2023                     Respectfully submitted,
             New York, New York


                                        **/s/ Cavalier D. Knight**

                                        Cavalier D. Knight
                                        Managing Member
                                        Cavalier Knight LLC
                                        511 W 165th St # 627
                                        New York, NY 10032-0634
                                        +1 (646) 580-7801
                                        info@cavalierknight.com