No. 16-CV-8191 (KMK)

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

# Doe v. Putnam Cnty.

344 F. Supp. 3d 518 (S.D.N.Y. 2018)

Decided Sep 28, 2018

No. 16-CV-8191 (KMK)

09-28-2018

John DOE NO. 1; and John Doe No. 2, Plaintiffs, v. PUTNAM COUNTY; and Michael C. Bartolotti, in His Official Capacity of County Clerk for Putnam County, Defendants, State of New York Attorney General, Intervenor.

Charles J. Cooper, Esq., David H. Thompson, Esq., Peter A. Patterson, Esq., Davis Cooper, Esq., Cooper & Kirk, PLLC, Washington, D.C., Counsel for Plaintiffs Mark Eliott Klein, Esq., Monica Anne Connell, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Intervenor State of New York Attorney General

KENNETH M. KARAS, District Judge

522   *522

Charles J. Cooper, Esq., David H. Thompson, Esq., Peter A. Patterson, Esq., Davis Cooper, Esq., Cooper & Kirk, PLLC, Washington, D.C., Counsel for Plaintiffs

Mark Eliott Klein, Esq., Monica Anne Connell, Esq., New York State Office of the Attorney General, New York, NY, Counsel for Intervenor State of New York Attorney General

OPINION & ORDER

KENNETH M. KARAS, District Judge

Plaintiffs John Doe No. 1 ("Doe No. 1") and John Doe No. 2 ("Doe No. 2," together, "Plaintiffs"), and the New York State Rifle and Pistol Association, Inc. ("NYSRPA") filed the instant Complaint against Putnam County and the County Clerk for Putnam County (collectively, "Defendants"), alleging that New York Penal Law § 400.00(5)(a), which makes the names and addresses of all handgun permit holders a matter of public record, "(1) violates the due process right to privacy under the Fourteenth Amendment and (2) impermissibly chills the free and uninhibited exercise of fundamental Second Amendment rights." (Compl. ¶ 3 (Dkt. No. 1).)[1] Before the Court is Intervener New York Attorney General's ("NYAG") Motion To Dismiss (the "Motion"). (Notice of Motion (Dkt. No. 57).) For the following reasons, the Motion is granted in part and denied in part.

[1] In an Order dated November 11, 2017, the Court held that NYSRPA lacked standing and dismissed it as a plaintiff. (Standing Order (Dkt. No. 45).)

I. Background

A. Factual Background

The following facts are drawn from Plaintiffs' Complaint and are taken as true for the purpose of resolving the instant Motion. (Compl.)

1. New York Penal Law § 400.00

New York State regulates the possession of firearms through a licensing scheme, N.Y. Penal Law § 400.00, and several criminal statutes, N.Y.

Penal Law §§ 265.01 – 265.04, 265.20(a)(3).[2] Section 400.00"is the exclusive statutory mechanism *523 for the licensing of firearms in New York State." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 85 (2d Cir. 2012) (internal quotation marks omitted). Generally, New York State prohibits possession of a firearm without a license. *Id.* To obtain a firearms license under § 400.00, applicants must be over 21 years old, have "good moral character," have no history of crime or mental illness, and demonstrate no "good cause" to deny the license. *Id.* at 86 (citing N.Y. Penal Law § 400.00(1)(a)-(d), (g) ). Section 400.00(5)(a) provides that "the name and address of any person to whom an application for any license has been granted shall be a public record." The statute provides an opportunity to request an exception to the public disclosure requirement at the time of application or "after a license or recertification has been granted." *Id.* §§ 400.00(5)(b)-(c), (e)(ii). The grounds for seeking such an exception are:

[2] New York law defines a "firearm" to include pistols and revolvers; shotguns with barrels less than eighteen inches in length; rifles with barrels less than sixteen inches in length; "any weapon made from a shotgun or rifle" with an overall length of less than twenty-six inches; and assault weapons. N.Y. Penal Law § 265.00(3). Rifles and shotguns are otherwise not subject to New York's licensing provisions. *Id.*

(i) the applicant's life or safety may be endangered by disclosure because:

(A) the applicant is an active or retired police officer, peace officer, probation officer, parole officer, or corrections officer;

(B) the applicant is a protected person under a currently valid order of protection;

(C) the applicant is or was a witness in a criminal proceeding involving a criminal charge;

(D) the applicant is participating or previously participated as a juror in a criminal proceeding, or is or was a member of a grand jury; or

(E) the applicant is a spouse, domestic partner or household member of a person identified in this subparagraph or subparagraph (ii) of this paragraph, specifying which subparagraph or subparagraphs and clauses apply.

(ii) the applicant has reason to believe his or her life or safety may be endangered by disclosure due to reasons stated by the applicant.

(iii) the applicant has reason to believe he or she may be subject to unwarranted harassment upon disclosure of such information.

*Id.* § 400.00(5)(b).[3] Upon receiving a request for such an exception, "the licensing officer shall grant such exception, unless the request is determined to be null and void." *Id.* § 400.00(e)(i). If the exception is denied, the applicant or license holder may seek review of that denial under Article 78 of New York's Civil Practice Law and Rules. *Id.* § 400.00(5)(g). Disclosure of the permit

holder's information cannot be made while the Article 78 proceeding is ongoing. *Id.* Those seeking an exception are warned on the application that, "upon discovery that an applicant knowingly provided false information, such applicant may be subject to penalties," of up to a year in jail. *Id.* § 400.00(5)(b) (citing § 175.30 (providing that furnishing false information to a public official in writing is a crime punishable by up to a year in jail) ).

<hr>

3   The exception provision was added by the New York State Legislature in 2013 in response to requests under New York's Freedom of Information Law to produce the names and addresses of all firearms permit holders. (NYAG Mem. of Law in Supp. of Mot. To Dismiss ("NYAG Mem.") 4 n. 6 (Dkt. No. 59); Pls.' Mem. Law in Opp'n to Mot. To Dismiss ("Pls.' Mem.") 2 (Dkt. No. 64).) Those requests are described in Section I.A.2.

### 2. The Journal News Request

On December 17, 2012, The Journal News, a local newspaper in the suburban New York counties of Westchester, Rockland, and Putnam, filed a request under the New York Freedom of Information Law ("FOIL") with the Putnam County Clerk, seeking the names and addresses *524 for all handgun permit holders in Putnam County. (Compl. ¶ 14.) On January 18, 2013, the Clerk of Putnam County denied the FOIL request, believing such a disclosure "would constitute an unwarranted invasion of personal privacy." (*Id.* ¶¶ 2, 14.)[4]

<hr>

4   The Journal News made the same request to the clerks of Westchester and Rockland Counties, and on December 24, 2012, The Journal News published an interactive map that identified, by name and address, every person residing in Westchester and Rockland Counties who possessed a firearm permit. (Compl. ¶ 1.)

On May 13, 2013, the Journal News filed a second FOIL request for the information, which Putnam County again denied. (*Id.* ¶ 15.) The Journal News then brought an action in the New York State Supreme Court, Westchester County, in 2013 to obtain the names and addresses of all handgun permit holders in Putnam County. (*Id.* ) In 2014, the trial court ruled against Putnam County, and ordered the Clerk of Putnam County "to comply with [The Journal News'] request for the names and addresses of all pistol permit holders in Putnam County who had not qualified ... to exempt themselves from disclosure." (*Id.* (quoting *Gannett Satellite Info. Network, Inc. v. Cty. of Putnam* , 142 A.D.3d 1012, 37 N.Y.S.3d 299, 302 (2016).) On appeal, the Appellate Division affirmed the trial court's order requiring disclosure. (Compl. ¶ 16 (quoting *Gannett* , 37 N.Y.S.3d at 305 ).) The Appellate Division noted FOIL contained certain exceptions to disclosure, but concluded Putnam County "failed to sustain their burden of demonstrating the applicability of the asserted exemption." *Id.* at 304.

Since then, The Journal News has stated it is no longer seeking the names and addresses of handgun permit holders in Putnam County. (Letter from William J. Taylor, Jr., Esq. to Court (Nov. 30, 2016) ("NYAG Letter") 3 & n.3 (Dkt. No. 39).) Putnam County decided not to appeal the Appellate Division's decision, and intends to comply with the Appellate Division's order. (Letter from James. A. Randazzo, Esq. to Court (Dec. 9, 2016) ("Defs.' Letter") 1–2 (Dkt. No. 40).)

### 3. Doe No. 1 and Doe No. 2

Plaintiffs are residents of Putnam County. (*See* Compl. ¶¶ 4–5.) Doe No. 1 has a permit and owns a handgun, and objects to disclosure of his name and address as a handgun permit holder. (*See id.* ¶¶ 20–22.) Doe No. 1 alleges he does not qualify for and thus has not applied for an exception to disclosure pursuant to § 500.00(5)(b), because "[h]e does not have reason to believe that his life or

safety may be endangered or that he may be subject to unwarranted harassment if his name and address as a permit holder is disclosed publicly." (*Id.* ¶ 21; *see also* Pls.' Mem. Law in Supp. of Prelim. Inj. ("Pls.' Prelim. Inj. Mem.") Ex. C ("Decl. of John Doe No. 1") ¶ 9 (Dkt. No. 12).) However, Doe No. 1 has privacy objections to disclosure of his name, address, and status as a permit holder, because "[h]e believes that his status as a handgun owner and permit holder is a private, personal matter, and that public disclosure of that information will subject him to unwanted public attention and censure by those in the community who are hostile to guns and gun owners." (Compl. ¶ 22; *see also* Decl. of John Doe No. 1 ¶ 10.)

Doe No. 2 claims that he desires to own a handgun, and would satisfy the requirements under § 400.00(1) to obtain a firearm permit, but has refrained from doing so because of privacy objections to disclosure of his name and address. (*See* Compl. ¶ 23–25.) Doe No. 2 is a law-abiding and responsible former police officer and a former member of the United States Coast Guard, and is highly trained in the proper and responsible use and maintenance of *525 handguns. (Compl. ¶ 23.) Doe No. 2 alleges that he does not qualify for any of the exceptions to disclosure listed in § 400.00(5)(b), because he "does not face specific threats that differentiate him from the typical, law-abiding citizen," and "[h]e does not have reason to believe that his life or safety may be endangered or that he may be subject to unwarranted harassment if his name and address as a permit holder is disclosed publicly." (Compl. ¶ 24; *see also* Pls.' Prelim. Inj. Mem Ex. C ("Decl. of John Doe No. 2") ¶ 9 (Dkt. No. 12).) Doe No. 2 has privacy objections to disclosure of his name, address, and status as a permit holder, because "[h]e believes that one's status as a handgun permit holder is a private, personal matter and that public disclosure of that information would subject the permit holder to

unwanted public attention and censure by those in the community who are hostile to guns and gun owners." (*Id.* ¶ 25; Decl. of John Doe No. 2 ¶ 9.)

Plaintiffs seek a declaration that the public disclosure requirement in § 400.00(5)(a) is facially unconstitutional, as well as a permanent injunction prohibiting Putnam County from disclosing the names and addresses of handgun permit holders. (*See* Compl. 10).

B. Procedural History

Plaintiffs filed the Complaint on October 19, 2016. (Dkt. No. 1.) On October 21, 2016, Plaintiffs filed a Motion for Preliminary Injunction, seeking to restrain Defendants from disclosing the names and addresses of residents of Putnam County who have obtained handgun permits under N.Y. Penal Law § 400.00. (Dkt. Nos. 11–12.)[5]

> [5] On October 2, 2016, Plaintiffs also filed a Notice of Constitutional Question, pursuant to Rule 5.1(1) of the Federal Rules of Civil Procedures. (Dkt. No. 14.) That same day, Plaintiffs filed a letter seeking a pre-motion conference to move for an order allowing the Doe No. 1 and Doe No. 2 to proceed under pseudonym. (Dkt. No. 13.) On November 1, 2016, Defendants informed the Court they did not object to the individual Plaintiffs proceeding under pseudonym. (Dkt. No. 23.) On November 16, 2016, the Court granted the request. (Dkt. No. 35.)

On November 2, 2016, Defendants informed the Court that they did not oppose the issuance of the requested preliminary injunction. (Dkt. No. 24.) The Court held a conference on November 16, 2016, and temporarily granted Plaintiffs' Motion for a Preliminary Injunction. (Order Granting Prelim. Inj. ("Prelim. Inj. Order") (Dkt. No. 33).) The Court asked the NYAG to notify the Court by November 30, 2016, whether it planned to intervene to defend the constitutionality of NY Penal Law § 400.00(5)(a). (*Id.* ) On November 16,

2016, Defendants answered the Complaint. (Dkt. No. 34.) In a letter to the Court on November 30, 2016, the NYAG responded that the "Office has concluded that there are serious jurisdictional obstacles to the Court's consideration of [P]laintiffs' claims." (NYAG Letter 1.) Accordingly, the NYAG "decided not to participate at th[at] juncture in the proceedings." (*Id.* at 1–2.) On December 9, 2016, Plaintiffs responded to the jurisdictional concerns raised by the NYAG. (Dkt. No. 41.) On December 9, 2016, Defendants filed a letter informing the Court that they would not take a stand on the jurisdictional issues, but responded to certain assumptions in the letter regarding whether Defendants would disregard the Appellate Division's decision. (Dkt. No. 40.) On November 13, 2017, the Court issued an Order concluding that, at that point in the proceedings, the jurisdictional obstacles raised by the NYAG did not prevent the Court from retaining jurisdiction over Plaintiffs' facial challenge to § 400.00(5), however, as noted, the Court also found that the NYSPRA did not have ⁵²⁶ *526 standing to bring the suit. (Standing Order (Dkt. No. 45).)

On December 1, 2017, the NYAG wrote a letter seeking to intervene, (Dkt. No. 47), and on December 4, 2017, Plaintiffs informed the Court that they did not oppose the NYAG's request, (Dkt. No. 48). On December 5, 2018, the Court granted the motion. (Dkt. No. 49.) On December 22, 2017, the NYAG filed a pre-motion letter indicating the grounds on which it would move to dismiss the Complaint. (Dkt. No. 50.) On October 15, 2015, Plaintiff opposed the request. (Dkt. No. 51.) On December 29, 2017, the Court set a briefing schedule for the instant Motion. (Dkt. No. 52.)

After an extension, on February 16, 2018, the NYAG filed the Motion, and accompanying memorandum of law and declaration. (Notice of Motion; Decl. of William J. Taylor, Jr., Esq. ("Taylor Decl.") (Dkt. No. 58); NYAG Mem. of Law in Supp. of Mot. To Dismiss ("NYAG

Mem.") (Dkt. No. 59).) On April 16, 2018, Plaintiffs filed their opposition to the Motion. (Pls.' Mem. Law in Opp'n to Mot. To Dismiss ("Pls.' Mem.") (Dkt. No. 64).) On May 29, 2018, the NYAG filed its reply memorandum. (NYAG Reply Mem. of Law in Supp. of Mot. To Dismiss ("NYAG Reply Mem.") (Dkt. No. 72).)

## II. Discussion

### A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.' " *Gonzalez v. Option One Mortg. Corp.* , No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.* , 318 F.3d 113, 128 (2d Cir. 2003) ).

### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele* , 25 F.Supp.3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.* , 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd* , 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) ; *United States v. Bond* , 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (internal quotation marks omitted) ).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. *See Carter v. HealthPort Techs., LLC* , 822 F.3d 47, 56 (2d Cir. 2016). When a defendant raises a facial challenge to standing based solely on the complaint and the

documents attached to it, "the plaintiff has no evidentiary burden" and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL* , 671 F.3d 140, 145 (2d Cir. 2011) ). In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor. *Id.* at 57. However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial. *Katz v. Donna Karan Co., LLC* , 872 F.3d 114, 119 (2d Cir. 2017). If the extrinsic evidence presented by the defendant is material 527 and *527 controverted, the Court must make findings of fact in aid of its decision as to standing. *Carter* , 822 F.3d at 57. Here, the NYAG raises a facial challenge to standing.

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly* , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly* , 550 U.S. at 555, 127

S.Ct. 1955. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, 127 S.Ct. 1955, if a plaintiff has not "nudged [her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* ; *see also Iqbal* , 556 U.S. at 679, 129 S.Ct. 1937 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2) ) ); *id.* at 678–79, 129 S.Ct. 1937 (" Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus* , 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.* , 992 F.Supp.2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC* , 699 F.3d 141, 145 (2d Cir. 2012) ). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.* , 199 F.3d 99, 107 (2d Cir. 1999) (internal

quotation marks omitted); *see also Wang v. Palmisano*, 157 F.Supp.3d 306, 317 (S.D.N.Y. 2016) (same).

## B. Article III Claims

Before turning to the merits of Plaintiffs' Second and Fourteenth Amendment claims, the Court must address the NYAG's argument that the Court lacks subject matter jurisdiction because Plaintiffs do not have standing, the claims are not ripe, and there is no live case or controversy between the Parties. (NYAG Mem. 8–14.)*528  1. Standing

The NYAG argues that Plaintiffs cannot meet their burden of showing an actual or imminent injury sufficient to support Article III standing to sue. (NYAG Mem. 9–10.)

"The jurisdiction of federal courts is defined and limited by Article III of the Constitution ... [, and] the judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.' " *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). "[A]t [the] uncontroverted core [of the 'case or controversy' requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). "In order to meet that requirement, plaintiffs must, among other things, establish that they have standing to sue." *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) [hereinafter *ACLU* ]. To meet that minimum constitutional threshold of standing, a plaintiff must establish three things:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of —the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks, citations, and alterations omitted). Each element "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. At the pleading stage, a plaintiff need only "clearly ... allege facts demonstrating" each element. *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Additionally, "[t]o establish standing to obtain prospective relief," in this case, declaratory relief, "a plaintiff must show a likelihood that he [or she] will be injured in the future," *Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (internal quotation marks omitted), "[t]hat is, a plaintiff must demonstrate a 'certainly impending' future injury." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ). To do so, "a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that injury would be prevented by the equitable relief sought." *Id.* Thus, a plaintiff may allege a "future injury" if he or she shows that "the threatened injury is 'certainly impending,' *or* there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 134 S.Ct. 2334, 2341,

189 L.Ed.2d 246 (2014) (emphasis added) (quoting *Clapper v. Amnesty Int'l USA* , 568 U.S. 398, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) [hereinafter *Clapper* ] ).

The Court concludes at this stage of the proceeding that Doe No. 1 has sufficiently alleged that he meets the standing requirements as to the Fourteenth Amendment claim, and that Doe No. 2 has sufficiently alleged that he meets the standing requirements for both the Fourteenth and Second Amendment claims. The injury-in-fact requirement is meant to "ensure that the plaintiff has a 'personal stake in the outcome of the controversy,' " *529 *Susan B. Anthony List* , 134 S.Ct. at 2341 (quoting *Warth* , 422 U.S. at 498, 95 S.Ct. 2197 ), and is "the proper party to bring this suit," *Carter* , 822 F.3d at 55 (internal quotation marks omitted). "For an injury to be 'actual or imminent,' Plaintiffs must show that they have sustained or are immediately in danger of sustaining some direct injury, that is not conjectural or hypothetical." *Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills* , 701 F.Supp.2d 568, 582 (S.D.N.Y. 2010) (internal quotation marks, citations, and alterations omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative ...." *Clapper* , 568 U.S. at 409, 133 S.Ct. 1138.

Doe No. 1 has alleged his name, address, and status as a handgun permit holder are a matter of public record as a result of § 400.00(5)(1). (Compl. ¶¶ 12, 19–22.) Doe No. 1 has a lawful permit and keeps a handgun in his home for protection, but does not qualify for and has not applied for any exception from disclosure under the statute. (*Id.* ¶¶ 20–21.) He is a proper party to bring a suit and has a personal stake in the outcome, as he has alleged he is suffering a direct constitutional injury to his due process right to privacy by this information being a matter of

public record which Putnam County would be required to provide to any party asking for it. (Compl. ¶¶ 3, 28–30.)

In *ACLU* , 785 F.3d 787, the Second Circuit held that individuals whose call records had been collected by the Government had standing to pursue a Fourth Amendment claim of "injury from the collection, and maintenance in a government database, of records relating to them," whether or not such claims would prevail on the merits, and a First Amendment associational rights claim because "any potential 'chilling effect' is created" at the time "the government collects [the plaintiffs'] metadata," because that is when "[the] interests in keeping their associations and contacts private are implicated." *Id.* at 801–02. The Second Circuit found the case easily distinguished from the Supreme Court's holding in *Clapper* , where the plaintiffs had alleged only a "speculative chain of possibilities" that could result in Government surveillance of their communications, because there was "no speculation whatsoever as to how events will unfold ... the records have been collected," thus, the "speculative chain of possibilities" was, "in th[at] context, a reality." *Id.* Although the Second Circuit was also considering the data collection in the context of a Fourth Amendment search claim, the Court finds the comparison between what constituted a merely speculative chain of possibilities in *Clapper* , versus a "reality" in *ACLU* relevant to the analysis here. *Id.* at 802. Doe No. 1 has alleged his information has been collected—not that it merely could be collected—and that it is at risk of being released publicly should anyone ask. Such a claim does not rely on the multi-step "speculative chain of possibilities" rejected by the Supreme Court in *Clapper* .

Similarly, in *Cutshall v. Sundquist* , 193 F.3d 466 (6th Cir. 1999), the Sixth Circuit held that a sex offender had established an injury in fact sufficient to challenge a statute requiring he be listed on a sex offender registry. The Sixth Circuit held that "release of [sex offender] registry information can

take place at any time enforcement officials have determined that release is necessary to protect the public," thus the plaintiff "face[d] a specific threat of being subject to the release of registry information every day." *Id.* at 472. The Sixth Circuit rejected the state of Tennessee's argument that there was no injury because the information was not yet released, holding that the plaintiff was not "required to wait until after his registry **530** information is \*530 released before" bringing the lawsuit challenging the statute. *Id.* Here, just as in *Cutshall* , release of Doe No. 1's name, address, and status as a handgun permit holder can take place anytime someone requests the information, and Doe No. 1 faces a specific threat of being subject to the release of this information every day.[6] Doe No. 1 should not have to wait until the information is actually released before bringing a lawsuit challenging the statute. Accordingly, Doe No. 1 has plausibly alleged he will continue to be injured in the future, because, barring the Court's injunction, his information would readily be accessible as a matter of public record. *Id.* (rejecting notion that a convicted sex offender only has standing to challenge the release of the offender's personal information until its release); *see also N.Y. Youth Club v. Town of Harrison* , 150 F.Supp.3d 264, 277 (S.D.N.Y. 2015) ("It is well-established that impairment of rights guaranteed by the Constitution is an injury sufficient to confer standing."). Thus, the Court finds Doe No. 1 has sufficiently alleged he has standing at this stage of the proceedings to proceed with the Fourteenth Amendment claim.

---

[6] The NYAG argues *Cutshall* is distinguishable because § 400.005 has an exception provision. (NYAG Mem. 11–12.) However, Doe No. 1 has alleged the exception does not apply to him. The mere existence of such a provision is of no consequence to the threat Doe No. 1 faces of his name, address, and status as a firearm holder being released if the exception does not apply to him. Additionally, the NYAG's attempt to distinguish *Cutshall* because the release of information in that case would be by the government, while the release of the information here requires someone to file a FOIL request, does not change the fact that at any time, someone could decide he or she desires to make the information public.

Doe No. 1, however, lacks standing as to the Second Amendment claim. He has already acquired a firearm license, (Compl. ¶ 20), and thus cannot allege any injury to his Second Amendment rights, *see Libertarian Party of Erie Cty. v. Cuomo* , 300 F.Supp.3d 424, 434 (W.D.N.Y. 2018) (noting that "[n]o court has held that an individual who applied for and received a firearms license has standing to challenge the constitutional validity of the licensing laws"). That he may object to the subsequent disclosure of his name for choosing to procure a firearm license bears on his Fourteenth Amendment privacy right, but having vindicated his Second Amendment right to possess a handgun in the home for self-defense, he has no standing to bring a Second Amendment challenge to the statute.

Doe No. 2 alleges he has not yet applied for a handgun permit because of the public disclosure requirement of § 400.00(5)(1), and thus is not currently subject to the record keeping requirements. (Compl. ¶¶ 25, 35.) Doe No. 2 is a former police officer and former member of the United States Coast Guard, who alleges he satisfies the requirements to obtain a handgun permit under New York law, but does not qualify for any exception from disclosure under the statute. (*Id.* ¶¶ 23–25.)[7] Doe No. 2 has sufficiently alleged an "invasion of a legally protected interest" at this point in the proceedings because he has alleged a direct injury to his constitutional right to privacy and to the Second Amendment right to keep a gun in the home for self-defense. **531** While a \*531 plaintiff typically lacks standing to challenge New York State's licensing laws if he fails to apply for a firearms license in New York, there is an exception to this rule: a plaintiff who



fails to apply for a firearms license in New York has standing if he makes a "substantial showing" that his application "would have been futile." *United States v. Decastro* , 682 F.3d 160, 164 (2d Cir. 2012) (internal quotation marks omitted); *see also Libertarian Party of Erie Cty.* , 300 F.Supp.3d at 433 (internal quotation marks omitted). Requiring Doe No. 2 to apply for a handgun permit in order to challenge the statute would run head first into the constitutional challenge he raises to the licensing regime. His first claim is that were he to apply for a permit, release of his private information into the public record would violate his constitutional right to privacy. (Compl. ¶¶ 3, 28–30.) The second claim is that § 400.00(5) (a) infringes on his Second Amendment rights by requiring his personal information to be a matter of public record before exercising his Second Amendment right to own a firearm. (Compl. ¶¶ 3, 25, 35–39.) As a result, Doe No. 2 claims he is in a catch-22: vindication of his Second Amendment rights comes at the expense of his constitutional rights to privacy. (Compl. ¶ 17.)[8] Because none of the exceptions to disclosure allegedly apply to him, seeking one would be futile. The Court, at this stage, does not have to decide the merits of Doe No. 2's claims, only whether he has satisfied the standing requirements. On this point, there is ample authority to support the justiciability of Doe No. 2's claims. *See, e.g., Bach v. Pataki* , 408 F.3d 75, 83 (2d Cir. 2005) (rejecting the argument that the plaintiff must apply for concealed-firemen license for which the plaintiff was statutorily ineligible to have standing to challenge a firearm license statute), *overruled on other grounds, McDonald v. City of Chicago* , 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) ; *Kachalsky v. Cacace* , 817 F.Supp.2d 235, 250 (S.D.N.Y. 2011) (rejecting the claim that the plaintiffs must submit new applications for a handgun permit post-*McDonald* , 561 U.S. 742, 130 S.Ct. 3020, to have standing, because it would be futile given the state law that was the basis for the original denial of permit had not changed), *aff'd* , 701 F.3d 81 (2d Cir. 2012) ; *see also Ezell v. City of Chicago* , 651

F.3d 684, 695 (7th Cir. 2011) (finding the "injuries easily support Article III standing" for the plaintiffs' claim that Chicago's gun law "interferes with [plaintiffs'] right to possess firearms for self-defense"); *532 *Dearth v. Holder* , 641 F.3d 499, 502 (D.C. Cir. 2011) (rejecting the argument that a plaintiff who had not purchased a firearm lacked standing because the Government "has erected a regulatory scheme that precludes [the plaintiff] from truthfully completing the application form the Government requires for the purchase of a firearm"). The circumstances are analogous to a facial challenge under the First Amendment, where a plaintiff "need not have first sought and been denied any permit prior to filing a facial challenge." *Lamar Advert. of Penn, LLC v. Town of Orchard Park* , 356 F.3d 365, 374 (2d Cir. 2004) (emphasis omitted); *MacDonald v. Safir* , 206 F.3d 183, 189 (2d Cir. 2000) ("[T]here is no need for a party actually to apply or to request a permit in order to bring a facial challenge to an ordinance (or parts of it) ..."); *Charette v. Town of Oyster Bay* , 159 F.3d 749, 757 (2d Cir. 1998) (" [Making] no effort to apply for a permit .... does not, of course, deprive [the plaintiff] of standing to assert that the [zoning ordinance] is facially invalid ...."); *see also Young v. Hawaii* , 911 F.Supp.2d 972, 987 (D. Haw. 2012) ("If we assume that Hawaii's [gun laws] violate [the p]laintiff's federal constitutional rights, [the p]laintiff sufficiently alleges an injury and causation to establish standing for injunctive relief."), *rev'd in part on other grounds, appeal dismissed in part* , 896 F.3d 1044 (9th Cir. 2018).[9]

---

7  The Court notes that one of the exceptions to disclosure covers retired police officers. *See* N.Y. Penal Law § 400.00(5)(a)(i)(A). However, as noted, the Court is not, at this stage, evaluating the merit of Doe No. 2's claim that he does not fit within this exception. The Court accepts Doe No. 2's allegations that he would not qualify for this or any other exception as true.

Similarly, the Court accepts Doe No. 2's allegation that he satisfies the requirements to obtain a firearm license.

8   The NYAG argues that there is no "chilling" claim under the Second Amendment. (NYAG Mem. 13.) However, this argument goes to the merits of Plaintiffs' claims, not to standing. For the standing inquiry, the Court assumes the validity of the Plaintiffs' claims that their Second and Fourteenth Amendment rights have been violated. *Green Party of CT v. Garfield* , 537 F.Supp.2d 359, 366–67 (D. Conn. 2008) (noting "the defendants' argument that the triggering provision does not chill speech goes to the merits, not to standing"); *see also Dean v. Blumenthal* , 577 F.3d 60, 67 n.4 (2d Cir. 2009) (overturning district court's determination that the plaintiff lacked standing for incorrectly "conflat[ing] the requirement for an injury-in-fact with the constitutional validity of [the underlying] claim"); *Cohen v. Cannavo* , No. 11-CV-5482, 2012 WL 3999846, at *6 (S.D.N.Y. Sept. 12, 2012) ("[T]he Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." (internal quotation marks omitted) ).

The facts in *Robinson* , upon which the NYAG relies in making this argument, are easily distinguished. *Robinson v. Sessions* , 721 F. App'x 20, 23 n.2 (2d Cir.), *cert. denied* , ––– U.S. ––––, 138 S.Ct. 2584, 201 L.Ed.2d 296 (2018). There, the Second Circuit found the plaintiffs had failed to even allege they had or would be subject to the alleged background check procedures they took issue with, thus they had failed to alleged standing. *Id.* Here, there is no dispute Plaintiffs are subject to the disclosure requirement once they become registered firearms owners.

9   Although the Second Circuit has expressed caution in applying "substantive First Amendment principles wholesale into Second Amendment jurisprudence,'" the Supreme Court and the Second Circuit have used First Amendment principles as a guide to interpreting the Second Amendment on an issue-by-issue basis, and the Court finds the analogy appropriate in the standing context. *See, e.g., District of Columbia v. Heller* , 554 U.S. 570, 595, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (analogizing limitations on individual rights under the First Amendment with the Second Amendments); *Decastro* , 682 F.3d at 165, 167–168 (consulting the First Amendment principles in deciding whether a law substantially burdens Second Amendment rights); *accord Ezell* , 651 F.3d at 706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are ... appropriate, and ... we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context. (citations omitted) ).

Doe No. 2's claims are supported by *Sec. Indus. & Fin. Markets Ass'n v. Garfield* , 469 F.Supp.2d 25 (D. Conn. 2007). To enforce a law banning state contractors and "principals" of state contracts from contributing to political candidates, the Connecticut State Elections Enforcement Commission ("SEEC") was required to compile a master list of individuals to whom the statutory ban applied and publish the list on the state's internet website. *Id.* at 28. Anyone bidding on a contract was required to "sign an affidavit that indicates the contractor will provide the names of its top employees and their spouses and dependent children to the SEEC before it can be awarded a state contract." *Id.* at 33–34. Similar to § 400.00(5), the affidavit included a notice that making a false statement may subject the author to criminal penalties. *Id.* at 33. The Securities Industry and Financial Markets Association ("SIFMA") brought a claim on behalf of its

members arguing the disclosure and publication provision of the statute violates the Fourteenth Amendment's substantive due process clause. *Id.* at 32. In holding a SIFMA member (and therefore the organization) had standing to challenge the statute, the Court reasoned, "the equation is simple: no affidavit, no state contracts." *Id.* at 34. If its employees refused to comply with the statute's allegedly unconstitutional disclosure and publication provision, the state contractor was therefore left with the following options: (1) do not bid on or execute any state contracts [requiring the form]; or (2) execute state contracts and affidavits and do *533 not [comply with the disclosure requirement], thus risking criminal penalties for making a false statement. Under either of these scenarios, the state contractor would suffer an injury in fact that is both concrete and particular." *Id.* Here, too, the equation is similarly simple: no public disclosure, no firearm license. Doe No. 2, who does not believe he has a basis to seek an exception from public disclosure, is left with the option of (1) not seeking a firearm license, or (2) submitting a false application for an exception and risk criminal penalties for making a false statement. Similarly, Doe No. 1 is left with the option of (1) having his information public, or (2) submitting a false application for an exception and risk criminal penalties for making a false statement. Thus, both face an injury-in-fact that is similarly concrete and particular.

The NYAG argues that because The Journal News has abandoned its request for the information from Putnam County, there is no imminent injury. (NYAG Mem. 11.) However, Doe No. 2 is facing the imminent injury of not being able to apply for a firearm license without risking disclosure of his name, address, and status as a firearm license holder. *Sec. Indus. & Fin. Markets Ass'n* , 469 F.Supp.2d at 34 (finding injury imminent where organizations were choosing not to bid on contracts that included disclosure requirements, and thus would lose the contract). Moreover, Doe No. 1 has sufficiently alleged an "actual or

imminent" injury from the public availability of his private information. (Compl. ¶ 3, 28–30.) Those injuries exist even without a party currently seeking the information, as it remains the case, allege Plaintiffs, that any party could easily seek and obtain the permit information. Indeed, it states the obvious that there are organizations other than The Journal News that might seek the information under § 400.00(5)(a).[10]

> [10] It is worth noting that the NYAG's arguments regarding New York state's interest in enacting § 400.00(5), particularly the importance of enlisting the public in the enforcement of gun statutes, and the fact that "laws like New York's have often been used by the press and the public," (Pls.' Mem. 20), further suggest the injury Plaintiffs complain of is more then merely speculative, even if the Journal News specifically is no longer seeking the information.

The NYAG also argues that because the statute has a disclosure exception that Plaintiffs have not invoked, they are not injured. (NYAG Mem. 10, 12.) The exception the NYAG refers to is not unlimited in scope: it applies to applicants who have "reason to believe his or her life or safety may be endangered" or have "reason to believe he or she may be subject to unwarranted harassment upon disclosure of such information." N.Y. Penal Law § 400.00(5)(b)(iii). However, Plaintiffs have alleged they do not meet the requirements for the statutory exception because they have no reason to believe that their "life or safety may be endangered" or that they would "be subject to unwarranted harassment." (Compl. ¶¶ 21, 24, 34, 36.) Rather, Plaintiffs fear "unwanted public attention and censure by those in the community who are hostile to guns and gun owners." (Compl. ¶¶ 22, 25.) Based on the pleadings and Plaintiffs' declarations, the Court assumes this to be true at this stage of the litigation. *Warth* , 422 U.S. at 501–02, 95 S.Ct. 2197 (assuming the plaintiffs' factual claims true when considering standing at the motion to dismiss stage); *see also Dearth* , 641

F.3d at 501 (internal quotation marks) (considering "allegations of the complaint relevant to standing are true" for purposes of determining application for firearm would be futile).[11]

534 Plaintiffs thus *534 are not required to engage in the futile gesture of seeking an exception as a prerequisite to exercising jurisdiction. Bach , 408 F.3d at 83 (rejecting suggestion that a plaintiff must engage in the futile gesture of completing an application for which he or she is statutorily ineligible to create a justiciable controversy); Kachalsky , 817 F.Supp.2d at 250 (same). Plaintiffs have therefore made a plausible claim that have a sufficient stake in the outcome of this litigation to confer standing.

> [11] The NYAG makes much of the fact that Plaintiffs' concerns of "unwanted public attention and disclosure" likely qualify for the "harassment" exception. (NYAG Mem. 10, 12.) However, there is a distinction the NYAG has failed to discern between Plaintiffs not wanting their status as a gun owner public for fear of, for example, being shunned by community members hostile to guns, and fear of the type of bona fide threat of "unwanted harassment" the exception was written to cover. In any event, the extent to which there is daylight between the two concepts is a fact question that can be pursued during discovery.

### 2. Ripeness

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Nat'l Park Hospitality Ass'n v. Dep't of Interior , 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (internal quotation marks omitted). "Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." N.Y. Civil Liberties Union v. Grandeau , 528 F.3d 122, 130 n. 8 (2d Cir. 2008) (internal quotation marks and alterations omitted). Here, the NYAG's

"arguments as to standing and ripeness are essentially one and the same." Kachalsky , 817 F.Supp.2d at 248. (See NYAG Mem. 14 (arguing Plaintiffs' claims are not ripe "for the reasons already demonstrated" in the standing discussion").) Because Plaintiffs have sufficiently established an injury-in-fact, their facial challenge to § 400.00(5)(a) is ripe for adjudication at this time.

### 3. Adversarial Nature

Finally, the NYAG argues that because Plaintiffs and Putnam County agree that the names of the permit holders should not be public, there is no live case or controversy between the parties. (NYAG Mem. 14.) However, the Court stands by its prior finding that Defendants' agreement with Plaintiffs' position on the merits of this case is not dispositive. Putnam County informed the Court that it will comply with the Appellate Division's decision regarding disclosure of the names and addresses of handgun permit holders in Putnam County. (Dk. No. 40.) Thus, Putnam County is sufficiently adverse to Plaintiffs: absent a ruling from this Court, Putnam County would be required to release publically available data about Doe No. 1 (and Doe. No. 2 if he were to apply for a handgun) to any party seeking it. This is sufficient to give Plaintiffs standing to bring these claims. See, e.g., I.N.S. v. Chadha , 462 U.S. 919, 939–40, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (finding "adequate Art[icle] III adverseness" despite "INS's agreement with Chadha's position" because INS would have deported Chadha absent the Supreme Court's decision in favor of Chadha); see also United States v. Windsor , 570 U.S. 744, 746, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) ("The Government's position—agreeing with [the plaintiff's] legal contention but refusing to give it effect—meant that there was a justiciable controversy between the parties."). Any alternative result would be untenable, as government officials would be able to insulate a statute from judicial

535 review by simply declining to defend it. *535 Chadha , 462 U.S. at 939, 103 S.Ct. 2764 ("[I]t

would be a curious result if, in the administration of justice, a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual."). Further, just as any potential prudential concerns about the non-adversarial nature of the proceeding was remedied in *Chadha* by inviting and accepting briefing from Congress, here, too, the NYAG intervening in this litigation has resolved any potential concerns regarding the non-adversarial nature of the proceedings. *Id.* Thus, the Court concludes that Plaintiffs have satisfied the requirements of Article III.

## C. Second Amendment Right to Bear Arms

Having concluded that Doe No. 2 has standing at this stage to pursue the Second Amendment claim, the Court turns to the merits of Doe No. 2's Second Amendment claim. The Second Amendment of the U.S. Constitution provides: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller* , the Supreme Court found that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *D.C. v. Heller* , 554 U.S. 570, 592, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). *McDonald* extended *Heller's* principles to the states, and therefore the Court considers Plaintiff's Second Amendment claim within the framework announced by *Heller* . *See generally McDonald* , 561 U.S. 742, 130 S.Ct. 3020.

Though *Heller* recognized an individual right to "keep and bear arms," it provided that the right "was not unlimited." *Heller* , 554 U.S. at 595, 128 S.Ct. 2783 ; *see also id.* ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.* ") (emphasis in original); *Kwong v. Bloomberg* , 723 F.3d 160, 165 (2d Cir. 2013) (recognizing limitations). More specifically, *Heller* proclaimed

that nothing in the opinion should call into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27, 128 S.Ct. 2783.

Doe No. 2 brings a facial challenge to Penal Law § 400.00(5), and therefore must "establish that no set of circumstances exists under which the statute would be valid" under the Second Amendment. *Decastro* , 682 F.3d at 163 (internal quotation marks omitted). The Second Circuit has adopted a two-step approach to determine the constitutionality of firearm restrictions. First, the Court "consider[s] whether the restriction burdens conduct protected by the Second Amendment." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* , 804 F.3d 242, 254 (2d Cir. 2015). "If the challenged restriction does not implicate conduct within the scope of the Second Amendment, [the] analysis ends and the legislation stands." *Id.* "Otherwise, [the Court] move[s] to the second step of our inquiry, in which [it] must determine and apply the appropriate level of scrutiny." *Id.* "However, [in *Heller* ] the Supreme Court declined to announce the precise standard of review applicable to laws that infringe the Second Amendment right because the law at issue before it—a categorical ban on handguns—would be unconstitutional '[u]nder any of the standards of scrutiny that [the Supreme Court] ha[s] applied to enumerated constitutional rights.' " *Decastro* , 682 F.3d at 165 (quoting *536 *Heller* , 554 U.S. at 628–29, 128 S.Ct. 2783 ). While *Heller* did "reject[ ] mere rational basis review as insufficient for the type of regulation challenged there ... [a]t the same time, [the Second Circuit] and [other] Circuits have suggested that heightened scrutiny is not always appropriate." *New York State Rifle & Pistol Ass'n, Inc* , 804 F.3d at 258.

In *Decastro* , the Second Circuit held that the appropriate level of scrutiny under which a court reviews a statute or regulation in the Second Amendment context is determined by how substantially that statute or regulation burdens the exercise of one's Second Amendment rights and what alternatives exist for law abiding individuals to obtain firearms for self defense. 682 F.3d at 164. Thus, in determining whether heightened scrutiny applies, the Second Circuit has instructed courts to consider two factors: (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on the right." *New York State Rifle & Pistol Ass'n, Inc* , 804 F.3d at 259. "Laws that neither implicate the core protections of the Second Amendment nor substantially burden their exercise do not receive heightened scrutiny." *Id.* In other words, where the burden imposed by a regulation on firearms is a "marginal, incremental or even appreciable restraint on the right to keep and bear arms," it will not be subject to heightened scrutiny. *Id.* at 259. "Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller* ) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Id.* Where a substantial burden does exist, " [i]ntermediate scrutiny is generally the appropriate level of scrutiny." *United States v. Lahey* , 967 F.Supp.2d 731, 754 (S.D.N.Y. 2013).

Intermediate scrutiny is appropriate to analyze the constitutionality of § 400.00(b). Here, the licensing scheme in question applies to handgun ownership in one's home—in other words, it veers toward the core of the self-defense right recognized in *Heller* . *Heller* , 554 U.S. at 629, 128 S.Ct. 2783 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon."); *New York State Rifle & Pistol Ass'n, Inc. v. City of New York* , 883 F.3d 45, 56 (2d Cir. 2018) ("[A] statute can implicate the core of the Second Amendment's protections by

extending into the home, where the need for defense of self, family and property is most acute." (internal quotation marks omitted) ); *Kachalsky* , 701 F.3d at 89 ("Second Amendment guarantees are at their zenith within the home."). And, Doe No. 2 has no alternative means of obtaining a firearm in his home for self-defense other than using the licensing scheme, which subjects him to the public disclosure requirement and statutory exceptions.

The Parties disagree over the exact level of burden that exists from placing one's name, address, and status as a firearm license holder in the public record when obtaining a firearm. Doe No. 2 relies on *Thornburgh v. American College of Obstetricians and Gynecologists* , 476 U.S. 747, 767, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled on other grounds by Planned Parenthood of Se. Pennsylvania v. Casey* , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), which invalidated parts of a Pennsylvania abortion law requiring abortion records be made available to the public, to argue public disclosure of the names and addresses of handgun owners is a substantial burden. (Pls.' Mem. 12.) In striking down the Pennsylvania statute, the Supreme Court noted it "consistently has refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes *537 unpopular, activities." *Thornburgh* , 476 U.S. at 767, 106 S.Ct. 2169 (citing *Lamont v. Postmaster General* , 381 U.S. 301, 306–07, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (invalidating Post Office requirement that addressee affirmatively request delivery of "communist" materials in order to receive them); *Talley v. California* , 362 U.S. 60, 64–65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (striking down municipal ban on unsigned handbills); *NAACP v. Alabama ex rel. Patterson* , 357 U.S. 449, 462–465, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (invalidating compelled disclosure of NAACP membership list).

The NYAG responds that the burden imposed on Doe No. 2 by § 400.00(5) is more akin to the licensing fee in *Kwong* , 723 F.3d at 167, which was deemed de minimis. (NYAG Reply Mem. 12.) The NYAG further argues that First Amendment doctrine, and the holding in *Thornburgh* , should not be applied in the Second Amendment context. (*Id.* 9–14.) However, Doe No. 2 is correct that *Thornburgh* dealt with abortion, not First Amendment rights, and discussed its holding in the context of constitutional rights generally. 476 U.S. at 767, 106 S.Ct. 2169. And, the Second Circuit's hesitation in applying "substantive First Amendment principles" to the Second Amendment, *see Kachalsky* , 701 F.3d at 91, does not apply in this context, as the Second Circuit has noted it will "readily consult principles from other areas of constitutional law, including the First Amendment in determining whether a law substantially burdens Second Amendment rights." *New York State Rifle & Pistol Ass'n, Inc.* , 804 F.3d at 259 (internal quotation marks omitted); *see also Decastro* , 682 F.3d at 167 ("In deciding whether a law substantially burdens Second Amendment rights, it is ... appropriate to consult principles from other areas of constitutional law, including the First Amendment (to which *Heller* adverted repeatedly).”). The NYAG fails to articulate a reason the principles outlined in *Thornburgh* should not apply to the Second Amendment. Thus, applying *Thornburgh* , the Court concludes Doe No. 2 has plausibly alleged *some* burden on his Second Amendment rights. While difficult to quantify, the burden alleged from public disclosure of his name, address, and status as a handgun license holder is greater than the de minimis burden courts have associated with requirements such as licensing fees. *See, e.g., Kwong* , 723 F.3d at 167 (finding licensing fee de minimis burden).

Because the law implicates core Second Amendment protections, and places some burden on the exercise of Second Amendment rights, the Court will apply intermediate scrutiny. This is in accord with the general practice in the Second Circuit of applying intermediate scrutiny to a wide variety of laws implicating the Second Amendment. *See, e.g., New York State Rifle & Pistol Ass'n, Inc.* , 883 F.3d 45, 62 (2d Cir. 2018) (applying intermediate scrutiny to New York City law restricting the transportation of handguns covered by residence licenses beyond the premises of the licensed residence); *Maloney v. Singas* , 106 F.Supp.3d 300, 311 (E.D.N.Y. 2015) (noting that "a majority of courts have applied intermediate scrutiny to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of [weapons] in the home" (internal quotation marks omitted) ); *see also Kachalsky,* 701 F.3d at 93 (applying intermediate scrutiny to New York licensing scheme for carrying concealed handguns in public); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* , 990 F.Supp.2d 349, 367 (W.D.N.Y. 2013) (applying "a mild form of intermediate scrutiny" to restrictions posing "only modest burdens" on the right to possess firearms (quoting *Heller II,* 670 F.3d at 1262 ) ), *aff'd in relevant part* , 804 F.3d 242 (2d Cir. 2015) ; *538 United States v. Oppedisano,* No. 09-CR-0305, 2010 WL 4961663, at *2 (E.D.N.Y. Nov. 30, 2010) (applying intermediate scrutiny to challenge to federal statute prohibiting persons convicted of certain crimes from possessing firearms). Courts outside the Second Circuit have similarly applied intermediate scrutiny in evaluating firearms restrictions. *See, e.g., United States v. Reese* , 627 F.3d 792, 801–02 (10th Cir. 2010) (applying intermediate scrutiny to federal statute prohibiting an individual's possession of gun—even in the home—when subject to a protective order as opposed to a criminal conviction); *United States v. Chester* , 628 F.3d 673, 677, 682–84 (4th Cir. 2010) (applying intermediate scrutiny to federal statute prohibiting the possession of firearms by any person convicted of a misdemeanor domestic violence crime); *United States v. Skoien,* 614 F.3d 638, 641–42 (7th Cir. 2010) (en banc) (same as *Chester* ); *United States v. Marzzarella* , 614 F.3d

85, 97 (3d Cir. 2010) (applying intermediate scrutiny to law limiting possession of firearms with obliterated serial numbers because the law did not "severely limit the possession of firearms").[12]

> [12] Plaintiffs argue strict scrutiny should be applied. (Pls.' Mem. 17–19.) However, the Second Circuit has not yet applied this rigorous level of scrutiny to any statute in the Second Amendment context, even when faced with statutes banning possession of entire categories of weapons. *New York State Rifle & Pistol Ass'n, Inc.* , 804 F.3d at 254.

"Courts applying intermediate scrutiny in the Second Amendment context have concluded that the asserted governmental objective must be substantial or important and that there must be a reasonable, but not perfect, fit between the challenged regulation and the asserted objective." *Kwong v. Bloomberg* , 876 F.Supp.2d 246, 259 (S.D.N.Y. 2012), *aff'd* , 723 F.3d 160 (2d Cir. 2013). The Second Circuit has articulated this test in contexts outside the Second Amendment in much the same way: "Under intermediate scrutiny, the government must show that the challenged legislative enactment is substantially related to an important governmental interest." *Ramos v. Town of Vernon* , 353 F.3d 171, 175 (2d Cir. 2003) (applying intermediate scrutiny to nighttime juvenile curfew ordinance); *see also United States v. Laurent* , 861 F.Supp.2d 71, 98 (E.D.N.Y. 2011) ("Intermediate scrutiny has been formulated in a number of ways, all requiring some form of serious government interest and a substantial connection between furthering that interest and the limit on the constitutional right.").

Whether § 400.00(b) survives intermediate scrutiny is difficult to discern based on the record before the Court at the Motion To Dismiss stage, because the Court cannot resolve how the important government interest at stake fits with the challenged regulation absent more evidence on either question. The NYAG proffers conclusory assertions that FOIL serves the important interest of "shed[ding] light on government decision making" and permits "the electorate to make informed choices regarding governmental activities" and § 400.00(b) serves to aid the "law-enforcement interests served by the statute" by "enlist[ing] the public in the enforcement of" the statute." (NYAG Mem. 20.) While, in the abstract, these may be "important governmental interests," the NYAG fails to substantiate or explain how § 400.00(b) reasonably satisfies these objectives. Indeed, one could be skeptical about what additional assistance the public could provide in enforcing the licensing regime above and beyond what is gained from disclosure to just the government. The NYAG also point to articles discussing how the press uses the data to inform the public "about trends, accountability gaps and other potential problems in *539 a state's gun licensing scheme," but fails to expand on what the government's interest in such reporting is. (*Id.* ) In short, the NYAG, "needs to present some meaningful evidence, not mere assertions, to justify its" interest in the law. *Heller v. D.C.* , 670 F.3d 1244, 1259 (D.C. Cir. 2011). Thus, "[o]n the present record," the Court finds the NYAG "has not supplied evidence adequate to show a substantial relationship between [the public disclosure] requirements and an important governmental interest." *Id.* ; *see also Kole v. Vill. of Norridge* , 941 F.Supp.2d 933, 943 (N.D. Ill. 2013) (declining to resolve the merits of the Second Amendment claim on a motion to dismiss because "where courts will need to weigh both Second Amendment rights and state interests justifying some restrictions on those rights, actual evidence on the burdens, consequences, and governmental interests will be vital for sound judgment," and noting the importance of "a thorough and complete record that provides a reliable, accurate factual foundation for constitutional adjudication." (internal quotation marks omitted) ). This is not to say that the NYAG could not satisfy this burden in a summary judgment motion, or that the law necessarily fails

to survive intermediate scrutiny. Rather, the Court merely concludes that Plaintiffs have plausibly stated a Second Amendment claim.

### D. Fourteenth Amendment Right to Privacy

The NYAG argues that no legal authority supports Plaintiffs' assertion that an individual's decision to exercise his or her Second Amendment right to armed self-defense in the home is a private, personal matter that is protected from public disclosure by the government under the Constitutional right to privacy. (NYAG Mem. 21–25.)[13] The Court agrees.

> [13] Plaintiffs make clear they "do not challenge Putnam County's *collection* of personal identifying information, ... nor its *use* of that information in the performance of" its regulatory and law-enforcement duties. (Pls.' Mem. 21–22.)

The Fourteenth Amendment extends to individuals a fundamental right to privacy. *See Whalen v. Roe* , 429 U.S. 589, 600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (noting that individuals have a protectable "interest in avoiding disclosure of personal matters," but upholding a New York statute authorizing the state to record the names and addresses of patients who received prescriptions for certain drugs). The constitutional right to privacy protects those "personal rights that can be deemed fundamental or implicit in the concept of ordered liberty," *Roe v. Wade* , 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (internal quotation marks omitted), including "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul v. Davis* , 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). However, " [t]he exact nature and scope of the right to privacy has never been fully defined." *See Barry v. New York* , 712 F.2d 1554, 1558 (2d Cir. 1983) ; *see also Igneri v. Moore* , 898 F.2d 870, 873 (2d Cir. 1990) ("The constitutional right to privacy, although difficult to articulate precisely, has been firmly established."). In *Whalen* , the Supreme

Court reasoned that the Fourteenth Amendment's privacy protection extends to: (1) "the individual interest in avoiding disclosure of personal matters," and (2) "the interest in independence in making certain kinds of important decisions." *Id.* at 599–600, 97 S.Ct. 869. The first interest has been characterized as a "right to confidentiality" to distinguish it from the second, commonly referred to as the "right to autonomy." *Doe v. City of New York* , 15 F.3d 264, 267 (2d Cir. 1994). *540 Because Plaintiffs claim that personal information regarding gun ownership at risk of being publically disclosed, the Court must determine whether Plaintiffs have a right to keep the information about their gun ownership confidential. Even if such a right exists, the Court must then "apply intermediate scrutiny and uphold the statute only if a substantial government interest outweighs the burdened privacy right." *O'Connor v. Pierson* , 426 F.3d 187, 202–03 (2d Cir. 2005) ; *see also Doe,* 15 F.3d at 269–70 ("The city's interest in disseminating information ... must be 'substantial' and must be balanced against [the plaintiff's] right to confidentiality."); *Barry* , 712 F.2d at 1559–60 (applying intermediate scrutiny and holding that the financial disclosure requirement furthers a substantial state interest).[14]

> [14] The Court uses a "shocks the conscious test ... when information is disclosed by individual government entities and a plaintiff does not seek to challenge a regulation or law requiring disclosure." *Miron v. Town of Stratford* , 976 F.Supp.2d 120, 141 (D. Conn. 2013) (internal quotation marks omitted). Under either standard, the Court must first determine whether a right to privacy over the information in question exists.

The Second Circuit has consistently held that although the right to privacy is "one of the less easily delineated constitutional guarantees," it encompasses "the individual interest in avoiding disclosure of personal matters." *Statharos v. New York City Taxi & Limousine Comm'n* , 198 F.3d 317, 322 (2d Cir. 1999) (internal quotation marks

omitted); *see also Hancock v. Cty. of Rensselaer* , 882 F.3d 58, 65 (2d Cir. 2018) (noting the Second Circuit "ha[s] explicitly recognized the right to privacy in one's personal information"). However, "not all disclosures of private information will trigger constitutional protection." *Bloch v. Ribar* , 156 F.3d 673, 684 (6th Cir. 1998). Second Circuit law currently recognizes the right to privacy in one's personal information in a limited set of factual circumstances involving one's health and personal financial information. For example, in *Barry* , the Second Circuit held that individuals have a constitutionally protected interest in the confidentiality of certain personal financial information. *Id.* at 1558–59.[15] In *Doe* , the Second Circuit extended the confidentiality right to include personal medical protection. *Id.* 15 F.3d at 267. Specifically, the Court held that plaintiff had a right to privacy regarding his HIV status since his personal medical condition "is a matter that he is normally entitled to keep private." *Id.* at 269 ; *see also Barry* , 712 F.2d at 1562 ("We do not think ... the release of information that is not 'highly personal' rises to the level of a constitutional violation."). The Court reasoned that the "[e]xtension of the right to confidentiality to personal medical information recognizes there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over." *Doe* , 15 F.3d at 267. The court continued, "[a]n individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance, further necessitating the extension of the right to confidentiality over such information." *Id.* Since then, district courts in the Second Circuit have extended the right to confidentiality to encompass protection against the public dissemination of details of a sexual assault. *See, e.g., N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist.* , 348 F.Supp.2d 32, 37 (S.D.N.Y. 2004) (noting "[t]he nature of the abuse inflicted and the [s]tudent's adolescence are two factors which indicate that this *541 incident is so personal that it

541

should fall under the umbrella of privacy."); *Nassau Cty. Employee "L" v. Cty. of Nassau* , 345 F.Supp.2d 293, 302 (E.D.N.Y. 2004) (noting "[v]ictims of sexual violence frequently encounter misdirected criticism and scrutiny that compounds their injuries. A historic stigma has attached to victims of sexual violence. In particular, a tradition of 'blaming the victim' of sexual violence sets these victims apart from those of other violent crimes." (internal quotation marks and alterations omitted).); *see also Sealed Plaintiff No. 1 v. Farber* , 212 F. App'x 42, 43 (2d Cir. 2007) (noting "a person's status as a juvenile sex abuse victim is clearly the type of 'highly personal' information that we have long recognized as protected by the Constitution from governmental dissemination absent a substantial government interest in disclosure"). Disclosure of one's name, address, and status as a firearm license is not one of the "very limited circumstances" in which the Second Circuit has found the right to privacy to exist. *Miron v. Town of Stratford* , 976 F.Supp.2d 120, 139 (D. Conn. 2013).[16] Accordingly, the Court grants the NYAG's Motion To Dismiss the Fourteenth Amendment claim.

[15] However, the Court upheld the disclosure law in *Barry* because it survived intermediate scrutiny. *Barry* , 712 F.2d at 1559–60.

[16] Plaintiffs rely on a Michigan state court decision holding that "gun ownership is an intimate or, for some persons, potentially embarrassing detail of one's personal life." (Pls.' Mem. 14 (quoting *Mager v. State* , 460 Mich. 134, 595 N.W.2d 142, 143–44 (1999).) Not only is this decision not binding on the Court, but in light of the Second Circuit's hesitation to extend the coverage of the constitutional right to privacy, the Court does not find one's status as a gun owner similar to the "intimate detail of a person's life," such as personal medication information. *Barry* , 712 F.2d at 1562 ("We do not think ... the release of

information that is not 'highly personal' rises to the level of a constitutional violation."); *O'Connor,* 426 F.3d at 201 ("Medical information in general ... is information of the most intimate kind."). This is in accord with other district courts which have declined to extend the right to privacy to cover various other circumstances. *Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454, 463 (2d Cir. 1996) (finding disclosure of organizations students volunteered with did not touch on constitutional right to privacy); *Thomas v. Pingotti,* No. 1 7-CV-0300, 2017 WL 3913018, at *8 (N.D.N.Y. Sept. 6, 2017) (finding no constitutional right to privacy regarding an individual's criminal history); *Johnson ex rel. Johnson v. Columbia Univ.,* No. 99-CV-341, 2003 WL 22743675, at *11 (S.D.N.Y. Nov. 19, 2003) (finding disclosure of names of family members, address, and telephone numbers did not rise to the level of private and intimate information to warrant constitutional protection); *Melendez v. Greiner,* No. 0l-CV-07888, 2003 WL 22434101, at *7 (S.D.N.Y. Oct. 23, 2003) (finding disclosure of corrections officers' professional records was not "an unwarranted invasion of privacy" because the information was "not ... highly personal or private information").

--------

## II. Conclusion

For the reasons noted herein, the Comi concludes that Doe No. 1 has standing to bring the Fourteenth Amendment claim and Doe No. 2 has standing to bring the Second and Fourteenth Amendment claims. The Court denies the NY AG's Motion To Dismiss as to the Second Amendment claim, but grants the Motion To Dismiss as to the Fourteenth Amendment Claim.

The Court will hold a conference on November 15, 2018 at 3:00 p.m. to discuss the status of the remaining claims. The Clerk of the Court is respectfully directed to terminate the pending Motion. (Dkt. No. 57.)

SO ORDERED.



